**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward NEDZA, Defendant–Appellant.**

**No. 87–2776.**

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1988.
Decided July 12, 1989.

Patrick A. Tuite, Tuite, Mejia & Giacchetti, Brent D. Stratton, Chicago, Ill., for defendant-appellant.

Anton Valukas, U.S. Atty., David J. Stetler, Chief Crim. U.S. Atty., James R. Ferguson and Victoria J. Peters, Deputy U.S. Attys., and Sheila Finnegan, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

Edward Nedza appeals his criminal conviction, following a jury trial, of one count of racketeering, one count of conspiracy to commit extortion, six counts of Hobbs Act extortion, a forfeiture judgment of $10,740, and four counts of filing false tax returns. We affirm.

I.

Factual Background

The following facts were adduced at trial. Early in 1980, businessman Leonard Kraus and his brother, Norman Kraus, planned to open a flea market on property they owned in Chicago's 31st Ward. Knowing of no other flea market operations within the city, Leonard Kraus ("Kraus") decided to "seek the blessings of the neighborhood politicians" before starting the business.

Kraus arranged to meet with Benedict "Sparky" Garmisa, the State Representative for the 31st Ward. He told Garmisa about the prospective venture and asked him whether it would be "all right with the powers to be" in the neighborhood. Kraus sought reassurance that "he wouldn't have any problems after [he] opened it up, because it was something that really wasn't tried in the City of Chicago." Garmisa replied that he would talk to Ed Nedza (the defendant) and Chester Kuta about it and

get back to Kraus.[1] Garmisa told Kraus that he wanted to invest in the enterprise. When Kraus responded that he and his brother did not need any investors, Garmisa replied, "Well, we'll talk about it further."

Two weeks later, Garmisa informed Kraus that he had discussed the flea market operation with Nedza and Kuta, and that it seemed acceptable to them. Garmisa advised Kraus to consider making Nedza and him partners in the business. Kraus emphasized that he did not need additional money or partners to which Garmisa responded, "Well, why don't we talk about it later."

Kraus and his brother discussed the demand by Garmisa and Nedza and decided to make a token offer to them to prevent any problems in the ward. Kraus subsequently met with Nedza and Garmisa and offered them twenty percent of the stock. Nedza and Garmisa rejected this offer as "unacceptable" and asked for fifty percent. Kraus explained that he and his brother had never had a fifty percent partner in any of their business ventures, and that they wanted to control the flea market. Nedza and Garmisa again stated that this was unacceptable. At that point, Kraus concluded the meeting, telling Nedza and Garmisa that he would get back to them later. After another week or so, Kraus visited Garmisa to tell him that he and his brother had decided to let Garmisa and Nedza invest in fifty percent of the business.

The specific terms of the agreement were ironed out at the next meeting. Nedza and Garmisa were to invest a combined total of $10,000 as were Kraus and his brother. Nedza and Garmisa informed Kraus that Kuta would share a portion of their (Nedza and Garmisa) fifty percent interest in the business. Nedza and Garmisa assured Kraus that they would take care of any problems he encountered in the ward, and that Kuta would act in their stead whenever Nedza and Garmisa were out of town. As a final point, Garmisa indicated that their (Nedza and Garmisa) investments would not be recorded in their names, but in the names of relatives.

Nedza and Garmisa each invested $4,000; Kuta paid in $2,000. The subscription agreement for the flea market indicates that $200 of Nedza's $4,000 payment went to the purchase of 200 shares of stock; the remainder ($3,800) was recorded as a loan. Nedza's stock was listed in his wife's name, and Garmisa and Kuta each had his stock issued in a daughter's name.[2]

Nedza, Garmisa and Kuta told Kraus that they expected him to make periodic payments in cash, beginning in 1981. That year, Nedza received the first payments from the flea market; six of the checks (totalling $1,280) were designated as repayment of the loan.

From time to time, each of the officials would call Kraus and demand money. After these calls, Kraus would examine the company's records and decide whether payments could be made, and in what amount. He would then stuff cash into three white envelopes and distribute them to each of the officials. These payments were never recorded in the flea market's books, although Kraus kept his own personal record of payments.[3] Nedza did not report these payments in his 1981 and 1982 tax returns, even though they were income. Nedza

---

1. At the time, Nedza was a state senator from the district encompassing Chicago's 31st Ward as well as the Democratic Ward Committeeman for the 31st Ward; Kuta was the 31st Ward Alderman.

2. In fact, none of the public official's names can be found in any of the flea market's business records.

3. The following payments were listed for Nedza:

| 1981 | |
|---|---|
| April 21 | $ 940 |
| November 17 | $2,400 |
| | $3,340 |
| 1982 | |
| February 16 | $1,000 |
| May 16 | $1,400 |
| June 7 | $1,000 |
| July 14 | $1,000 |
| August 16 | $1,000 |
| September 13 | $1,000 |
| October 13 | $1,000 |
| | $7,400 |

also failed to mention the payments or the interest in the flea market in his ethics statements for any year.

During the same time frame in which he was making payments to the officials, Kraus requested assistance with several problems that arose in connection with the flea market. For example, in September 1981, Kraus received notice from the Chicago Bureau of Fire Prevention that the flea market could not continue to operate at its location. Kraus immediately called Garmisa who said he would "get in touch with Nedza and that he [Nedza] would take care of it." When Kraus received another notice from the Fire Prevention Bureau a month or two later, he called the fire department himself and resolved the problem by making certain repairs.

In 1981, Kraus requested that the timing of a stoplight located near the flea market be changed for weekends.[4] Kraus was also interested in removing the no-parking signs on a street bordering the flea market. Kraus asked that Nedza, Garmisa and Kuta look into the matter; despite his request, the no-parking signs were never removed.

In late 1981, Kraus encountered problems with electrical inspectors; the inspectors told Kraus that all of the electricity at the flea market had to be changed within a month. Kraus contacted Garmisa who promised to take care of it. Kraus also spoke to Nedza, Garmisa, and Kuta about the problem at a meeting; the officials agreed to intervene. Kraus later met with Nedza at Nedza's office in the Streets and Sanitation Department at City Hall to determine how to obtain a permit for the required electrical work. Nedza telephoned someone at the Electrical Department to assist Kraus and, when the departmental worker came to his office, Nedza instructed him to take Kraus upstairs and "see what you can do for him." Even though the worker did so, Kraus was still unable to secure the permit.

Kraus subsequently discovered that he could not obtain the permit because the flea market was not properly zoned. Kraus complained to Nedza, Garmisa and Kuta that he had spent a lot of money to satisfy fire department regulations only to learn that the electrical problems could not be fixed due to zoning regulations. Kraus was particularly troubled since he had expected the officials to have known about zoning. He asked the three to check into the problem immediately.

Nothing further transpired, however, and in late 1982, Kraus ceased making cash payments to the officials. At about the same time, Kraus met with businessman James Allenson; Kraus paid Allenson $8,500 to resolve the electrical problems.[5]

In 1983 and 1984, the repairs to the flea market were either underway or almost complete, and Garmisa and Kuta were no longer public officials. Nonetheless, Nedza, Garmisa and Kuta continued to demand money from Kraus. At a meeting held in 1983, they asked Kraus why he no longer made the cash payments. Kraus told them that he was being "killed here with paying all this money and I'm not getting anything done." Kraus indicated that he would pay no more money until all the work was completed.

In 1984, Garmisa set up a meeting with himself, Nedza, Kuta and Kraus to discuss the financial records of the flea market. At the meeting, Garmisa again complained to Kraus about the absence of payments. Kraus insisted that he had discontinued the payments due to overwhelming expenses. The four then discussed the possibility of a buy-out; Kraus was informed that he should pay, in addition to repayment of the outstanding loan amounts, $30,000 each to Nedza and Garmisa for their stock, and

---

**4.** Nedza said that he would take care of this request. The parties are in disagreement as to whether, in fact, the timing of the light had been changed due to Nedza's intervention.

**5.** Kraus later learned that a portion of this money went to a Consumer Services Inspector. To solve the zoning problem, Allenson introduced Kraus to Victor Albanese; Kraus paid Albanese $16,000 to obtain the desired zoning change. Some of this money ($1,000) went to an alderman (not Kuta) who had opposed the zoning change; another portion reportedly was given to a judge.

$15,000 to Kuta. When Kraus protested, the price was negotiated down to $12,000 each for Nedza and Garmisa and $6,000 for Kuta, plus repayment of the loans. Shortly after the meeting, the parties signed agreements to this effect.[6] From February 1985 until November 1986, Nedza received a series of checks from Kraus and his brother for a total of $11,000.

On April 15, 1985, Nedza and Kraus met at a health club and, unbeknownst to Nedza, Kraus tape-recorded their conversation.[7] Nedza expressed concern over what Kuta might do. Nedza also worried about how he could explain the failure to report the cash payments in his tax returns.[8]

In a superseding indictment issued on July 13, 1987, Nedza was charged with one count of conspiracy to commit extortion in violation of 18 U.S.C. § 1951 (Count 1), six counts of Hobbs Act extortion under 18 U.S.C. § 1951 (Counts 2 through 7), four counts of filing false tax returns for 1981 and 1982 under 26 U.S.C. § 7206(1) (Counts 8 through 10), and one count of racketeering including a forfeiture charge under 18 U.S.C. § 1962(c) (Count 12).[9] Nedza's trial began on August 4, 1987.

At trial, Leonard Kraus appeared as the government's main witness. Kraus reported how the officials' investment scheme had developed. He also described how the payouts to the officials had been made.

Joanne Nedza, the defendant's wife, testified that the flea market stock had been put in her name because her husband traveled a lot and they were concerned that, if anything were to happen to him, she would be able to receive income without going to court. She conceded that all of their previous investments had been held in joint custody in both of their names. She also admitted that she and the defendant had realized a profit from the business in 1981 and 1982.

Nedza took the stand and explained that he had been introduced to Kraus by Garmisa and that Garmisa had told him that Kraus was seeking outside investors for the flea market. Nedza contended that the payments had been made in cash as a convenience to Kraus, and that he had not reported the payments on his tax returns because of his belief that the business was organized as a Subchapter S corporation. Nedza conceded that he had no knowledge of the tax aspects of a Subchapter S corporation, and that he had not discussed the matter with his accountant.

Nedza claimed that he first learned that the business was not organized as a Subchapter S corporation when he signed the buy-out agreement. He also stated that he did not know that a portion of his investment was listed as a loan. He testified that he had no idea how well the flea market had been doing since he had not seen a financial statement since 1982, nor had he ever seen a tax return for the business. As for the tape-recorded conversations, Nedza explained that he had been hoping to seek re-election, and his comments merely reflected his concern that Kuta might embarrass him politically by

---

**6.** In accordance with other documentation, the buy-out agreements were executed in the names of their relatives.

**7.** After learning that Allenson had recorded their conversation regarding the money Kraus had given to him to resolve the electrical problems, Kraus decided to cooperate with the government.

**8.** Nedza proposed to shield the purpose of the payments:

Oh, the only, the only thing the first thing that thought that comes in my mind ... is, uh ... file an amended tax return ... by complete ignorance. The consummation of it [the buyout] was last month and we didn't receive any money until this year, so it would have been this year that I would have mistaken it but then ... filing an amended tax return. Um ... uh, I would just, you know can't put previous payments.

In 1986, after he had been interviewed by federal agents, Nedza filed amended tax returns for 1981 and 1982.

**9.** In the same indictment, Chester Kuta was charged with filing a false tax return in 1982 and with depriving Kraus of property without due process of law in violation of 18 U.S.C. § 242; Leonard Kraus was charged with two counts of failing to file tax returns in violation of 26 U.S.C. § 7203. Both Kuta and Kraus pleaded guilty. Garmisa died prior to the return of the indictment against him.

revealing that Nedza had failed to report income on his tax returns.

Nedza also denied helping Kraus with problems that arose in the flea market's operation. He testified that in his role as Illinois senator, he had nothing to do with Chicago parking signs, traffic lights, building inspections, fire or electrical inspections, zoning issues, or flea markets. However, Illinois Senate President Phillip J. Rock testified that senators do exert power over matters not directly related to their official duties.

The jury convicted Nedza on all counts. The court sentenced him to eight years' imprisonment on Counts 2 through 7, three years' imprisonment on Counts 8 through 11, eight years' imprisonment and a fine of $10,000 on Count 12; all of these sentences run concurrently. The court suspended sentence on Count 1, placing Nedza on five years' probation consecutive to his incarceration; Nedza's probation is conditioned on his performing 1,000 hours of community service. His post-trial motions for relief were denied on October 21, 1987, and this appeal followed.

## II.

## Analysis

On appeal, Nedza contends that the district court erred in several respects. He urges that there was insufficient evidence to convict him of extortion and conspiracy to extort; he contends that the lack of proof of the extortion and bribery charges (the predicate acts for the RICO count) invalidates his conviction for racketeering.[10] He also charges that the district court improperly limited the scope of his cross-examination of Kraus, and that the court abused its discretion in refusing to admit witnesses who would have discredited Kraus' testimony. We will examine each of these arguments in turn.

### A. Sufficiency of the Evidence

Nedza argues that the government failed to establish beyond a reasonable doubt that he conspired to and did commit extortion, and that his acts violated RICO. A jury verdict will be upheld if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found against the defendant. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

### 1. Hobbs Act Violations

Nedza's convictions for conspiracy to extort and Hobbs Act extortion, in violation of 18 U.S.C. § 1951, must stand if the evidence indicates that the funds were obtained from Kraus through wrongful use of fear and under color of official right.[11] The first type of inducement is based on the fear that the official will wield his official powers against the payee, whereas the second is founded on a hope of benefit from the exercise of the official's influence. *United States v. Holzer*, 816 F.2d 304, 310 (7th Cir.), *vacated and remanded on other grounds*, 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987). Nedza asserts that the evidence is insufficient to hold him to either of these prongs.

---

**10.** Nedza asks for reversal of his convictions on all counts. However, he makes no argument with respect to his convictions for tax fraud, except to the extent that the challenges the court's failure to admit certain evidence purporting to show self-dealing by Kraus. This argument does not refute the evidence underlying the tax fraud counts. Accordingly, we will not discuss the sufficiency of the evidence underlying these charges.

**11.** The statute provides that
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—

. . . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
18 U.S.C. § 1951.

### a. Wrongful Use of Fear

■ "[E]xtortion by wrongful use of fear of economic harm is established by showing that the defendant preyed upon or exploited the victim's fear of economic harm." *United States v. Lisinski*, 728 F.2d 887, 890 (7th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984); *United States v. Margiotta*, 688 F.2d 108, 134 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). We conclude that this standard has been satisfied here.

Nedza charges that no direct evidence of a threat by Nedza had been shown. However, the evidence need not demonstrate that either a direct or indirect threat has been made, *Lisinski*, 728 F.2d at 889–91, nor is it necessary to show that the official made a specific demand for payment on threat of a specific sanction. *United States v. Murphy*, 768 F.2d 1518, 1530 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

As stated in *Holzer*, 816 F.2d at 310, "[a] threat is not a state of mind in the threatener; it is an appearance to the victim," so long as the victim's conclusion is reasonable. In this case, Kraus testified that he and his brother had not had outside investors in their previous business ventures, and that, at first, they had planned only to allow for a token investment by the officials. Kraus further stated that he accepted Garmisa, Nedza and Kuta as investors in the enterprise under fear of reprisal. The jury believed Kraus, and we will not disturb their credibility finding. *See United States v. Garner*, 837 F.2d 1404, 1423 (7th Cir.1987) (credibility findings are within the province of the jury), *cert. denied*, —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988).

### b. Color of Official Right

■ We next examine Nedza's contention that the evidence was insufficient to show that extortion occurred under color of official right.[12] Nedza makes several arguments on this point. He first insists that Kraus was unreasonable in believing that as a state senator, Nedza had the ability to impact a local business. However, *de jure* ability to perform the promised acts is not required. *United States v. Blackwood*, 768 F.2d 131, 134–35 (7th Cir.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed. 2d 554 (1985); *see also United States v. Rindone*, 631 F.2d 491, 495 (7th Cir.1980) (per curiam) (it is "immaterial whether the questioned transaction involves a promise by the official to undertake acts unrelated to his duties"). Furthermore, Senator Rock testified that state senators exercise enormous influence in areas outside the scope of their traditional duties.

As a second point, Nedza maintains that the evidence did not establish a reasonable belief that he could influence activities in the 31st Ward on behalf of the flea market. As proof that his office was not compromised, Nedza points to the fact that many of his interventions were unsuccessful. We note, however, that a Hobbs Act violation is complete at the time "one attempts to induce a victim engaged in interstate commerce to part with property." *United States v. Hocking*, 860 F.2d 769, 777 (7th Cir.1988) (citing *Rindone*, 631 F.2d at 493). Indeed, the issue is not whether the extortionist is ultimately effective. Rather, the point is whether Kraus would have reasonably believed, *at the time of the extortionate act*, that Nedza could deliver the power of his office for the victim's benefit. *See Blackwood*, 768 F.2d at 134–35; *United States v. Mazzei*, 521 F.2d 639, 643 (3d Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).[13]

---

**12.** The government does not rely on Nedza's status as a 31st Ward Committeeman as the basis for his misuse of office, but on Nedza's position as an Illinois state senator.

**13.** Wrongful use of office does not mean that the wrongdoer had to agree to perform a specific official act in exchange for a benefit; rather, extortion is committed if the official accepts the favor, knowing that it is motivated by a hope of influence. *Garner*, 837 F.2d at 1422 (citing *Holzer*, 816 F.2d at 310). Thus, Nedza's focus on his inability to secure an electrical permit or to change the parking conditions at the flea market is misplaced.

Finally, Nedza cites *United States v. Hedman*, 630 F.2d 1184, 1195 (7th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), for its language that in a Hobbs Act case, the government must prove that a public official obtained money "to which he was not entitled and which he obtained only because of his official position." *See also United States v. O'Keefe*, 825 F.2d 314, 320 (11th Cir.1987). Since the flea market was a legitimate business enterprise, Nedza argues, the funds he received stemmed from his business investment, and not from any illegal purpose. This contention ignores the observation of *Hedman* that it is the motivation for the payment which dictates whether the conduct falls within the Hobbs Act. *Hedman*, 630 F.2d at 1195 (citing *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974), *cert. denied sub nom. Barry v. United States*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975)).

Moreover, the evidence adduced at trial belies Nedza's assertion that the transaction was merely a legitimate business investment entered into by several public officials. The questionable nature of the payments and the failure to list the defendant and the others on the corporate books supports the jury's conclusion that an extortionate act occurred.

In sum, we conclude that there was sufficient evidence to support Nedza's convictions for conspiracy to commit extortion and extortion.

### 2. RICO Violation

■ Nedza was also convicted of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c).[14] Nedza maintains that since there was inadequate evidence to convict him of extortion or bribery, there was no predicate act to support the racketeering charge and the forfeiture. We have already determined that Nedza committed

extortion, and so this contention has no merit.

### B. Evidentiary Rulings

Nedza complains that several of the district court's evidentiary rulings were in error. We review a trial court's rulings concerning the admission and exclusion of evidence under the abuse of discretion standard. *United States v. Wellman*, 830 F.2d 1453, 1465 (7th Cir.1987); *Webb v. City of Chester*, 813 F.2d 824, 827 (7th Cir.1987).

Nedza contends that the court's limitation on the cross-examination of Kraus prevented him from exposing Kraus' motive to fabricate. For example, Nedza charges that Kraus took substantial funds from the flea market without the investors' knowledge. Therefore, Nedza claims, it was in Kraus' best interest to depict Nedza's interest in the business as extortionate in order to insulate himself from a shareholder's derivative suit. He also claims that had the jury heard how much Kraus gained from the buy-out (by buying back the shares at a cost well below market value), Kraus' entire version of events would have been considered implausible. Nedza complains that the district court erred in restricting cross-examination on Kraus' drawing of funds and in refusing to admit testimony of Kraus' self-dealing.

■ We see no abuse of discretion in the court's exclusion of testimony concerning Kraus' self-dealing. At best, the testimony would have suggested that Kraus lied in order to avoid a civil suit, not criminal liability for his acts. Moreover, the jury was presented with ample evidence of Kraus' business transactions. For example, Nedza questioned Kraus on the amount of salary he drew and the amount of payments that had been made to a realty company owned by Kraus.

■ As for the decision to restrict cross-examination and to exclude expert testimony concerning the valuation of the flea

14. The statute provides:
   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
   18 U.S.C. § 1962(c).

market shares at the time of the buy-out, we conclude that the court properly ruled. This information was presented to the jury. Defense counsel was able to question Kraus about the estimated worth of the flea market at the time of the buy-out, as well as the amount paid to Garmisa, Kuta and Nedza.

■ Nedza also objects to the district court's preclusion of cross-examination of Kraus concerning certain payments that Kraus made to other officials for matters outside of the flea market operation. The court allowed defense counsel to question Kraus about the payments he made to Allenson for matters relating to the flea market. We agree with the district court that Kraus' payments to officials concerning other business ventures had no relevancy to the present case.

Next, Nedza charges that he was unable to question Kraus on why he failed to report the extortion plot to the government, even though his brother had cooperated in a federal extortion case in 1980. This line of questioning, Nedza argues, would have validated his argument that the enterprise was legitimate—Kraus failed to report because there was no wrongdoing to report. The record reveals that the defense counsel asked Kraus whether he knew how to report extortion to the proper authorities. Thus, we see no error on this ground.

■ We also conclude that the court properly refused the testimony of Barbara Nudelman, an "anti-character" witness, who would have spoken of Kraus' poor reputation for truthtelling. Nudelman had attended high school with Kraus; at the time of trial, Kraus was about 57 years of age. During voir dire, Nudelman explained that her knowledge of Kraus' reputation derived from discussing Kraus with former classmates on two occasions. The first discussion occurred at a picnic in June 1986, whereas the second took place about two months prior to trial. However, the classmate with whom she spoke on the latter occasion had not seen Kraus for al-

most a year. The court thus determined that the basis for Nudelman's testimony as to Kraus' reputation in the community was inadequate, as well as too remote in time. We agree with this assessment.

Nedza now insists that Nudelman was presented to offer her personal opinion of Kraus, and that personal opinion testimony does not require recent contact. However, as the government points out, the defendant introduced Nudelman as a reputation witness. Therefore, the district court had no reason to determine whether Nudelman could properly testify as an opinion witness. Accordingly, Nedza cannot now claim error.

### III.

We hold that there was sufficient evidence to support Nedza's convictions, and that the district court did not abuse its discretion with respect to its evidentiary rulings. For these reasons, we affirm Nedza's convictions.

AFFIRMED.