UNITED STATES of America, Appellee,

v.

Leonid ABELIS, a/k/a "Shatera"; a/k/a "Lyonya"; Yakov Volovnik, Leonard Lev; And Yelena Lev, Defendants,

Valery Novak; Vladimir Topko; Sergey Ilgner; Vyacheslav Kirillovich Ivankov, a/k/a "Yaponchik," Defendants–Appellants.

Nos. 97–1077, 97–1080, 97–1088, 97–1107 and 97–1140 to 97–1142.

United States Court of Appeals, Second Circuit.

Argued Sept. 5, 1997.

Decided May 29, 1998.

Richard Ware Levitt, New York City, for Defendant–Appellant Valery Novak.

Jerry L. Tritz, New York City, for Defendant–Appellant Vladimir Topko.

Elizabeth M. Fink, Brooklyn, NY, for Defendant–Appellant Sergey Ilgner.

Judd Burstein, Burstein & Fass LLP, New York City, for Defendant–Appellant Vyacheslav Kirillovich Ivankov.

Bridget M. Rohde, Benton Campbell, Asst. U.S. Attys., Eastern District of New York (Zachary W. Carter, U.S. Atty., Eastern District of New York, Emily Berger, Asst. U.S. Atty., on brief), for Appellee.

Before CARDAMONE and LEVAL, Circuit Judges, and KOELTL,* District Judge.

KOELTL, District Judge:

Valery Novak ("Novak"), Vladimir Topko ("Topko"), Sergey Ilgner ("Ilgner"), and Vyacheslav Kirillovich Ivankov ("Ivankov") appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York (Carol Bagley Amon, Judge) following a six week jury trial. The jury convicted all four of conspiracy to commit extortion, in violation of 18 U.S.C. § 1951, and appellants Novak, Ilgner, and Ivankov of attempted extortion, in violation of 18 U.S.C. §§ 1951 and 2.

---

The appellants have asserted numerous grounds for alleged error. Finding no such error, we affirm.

## BACKGROUND

On appeal, we view the facts in the light most favorable to the Government. *See United States v. Doyle,* 130 F.3d 523, 526 (2d Cir.1997); *United States v. LaBarbara,* 129 F.3d 81, 82 (2d Cir.1997). Viewed in that light, the jury could have found that the evidence supported the following facts.

The victims of the attempted extortion in this case were Alexander Volkov ("Volkov") and Vladimir Voloshin ("Voloshin"), the president and vice-president, respectively, of Summit International ("Summit") a purported New York City investment firm. Both Volkov and Voloshin had a significant criminal history of their own, including ties to Russian criminal groups.

Summit, which began operations in September 1993, marketed itself to the Russian public as an investment firm with knowledge of Wall Street, and ultimately received over $8 million from its various Russian investors. However, Volkov and Voloshin had little or no experience in investing, and, rather than investing all of the money, spent much of it on themselves. As of 1995 they had only a small fraction of their investors' funds remaining.

The extortion at issue in this case was an attempt to force Volkov and Voloshin to pay the funds from one such investment in Summit, a $2.6 million loan by Moscow's Chara Bank ("Chara"), to various members of the conspiracy. Volkov and Voloshin had obtained this investment through a Chara Bank officer, Rustam Sadykov ("Sadykov"), whom they had known since their student days together at Moscow State University. Sadykov told Chara's President, Vladimir Rachouk ("Rachouk") about Summit and Rachouk agreed to loan the money to Summit to be invested in the stock market. No written agreement memorialized the transaction.

On November 25, 1994, Rachouk died under suspicious circumstances during a period when Chara was suffering financial difficul-

ties. Shortly after Rachouk's death, Sadykov traveled to New York City to meet Volkov and Voloshin to discuss the Chara loan. He was accompanied by Maxim Korostishevsky ("Korostishevsky") and Topko, Sadykov's close friend. These three met with Volkov and Voloshin on December 1, 1994. Sadykov was not authorized by Chara to travel to the United States, and neither Korostishevsky nor Topko were Chara employees.

At the December 1 meeting, Korostishevsky told Volkov and Voloshin of Rachouk's death and informed them that Rachouk's wife was trying to recoup Chara's money with the help of Russian criminal groups. Korostishevsky and Sadykov proposed to split the Chara money with Volkov and Voloshin, and, in return, Korostishevsky promised Volkov and Voloshin his protection from the various criminal groups attempting to collect the outstanding Chara loans. No agreement on a split was reached at this meeting, and all five went to the Russian Samovar restaurant for dinner. They were joined there by Yakov Volovnik, a Summit employee. At the Russian Samovar, Korostishevsky repeated that Rachouk's wife was going to hire criminals if the money was not returned.

Following dinner, on the street outside the restaurant, Topko introduced Voloshin to Novak, who was Topko's business partner, and the three drove to a nightclub. At some point during the evening, Voloshin asked Topko whether Topko was going to act as a representative for Korostishevsky and Sadykov regarding the payment of the Chara money. Topko replied, "Yes, something like that."

The next day, December 2, 1994, Korostishevsky, Topko, and Sadykov met for a second time with Volkov and Voloshin at Summit's office. After again discussing the division of the money, Volkov and Voloshin agreed to pay back the money, although they requested more time to consider the specific percentages for the division of the money. However, no payments were made because Voloshin flew to Moscow, where he remained until December 23, 1994. Volkov and Volovnik met with Sadykov and Novak at Michael's restaurant later in December. No-

vak, reminding Volkov of his promise to pay the money to Sadykov and Korostishevsky, said that "the people in Moscow are getting nervous now," asked when Volkov would begin making payments on the Chara loan, and reported that Summit's delay was putting Sadykov in a "bad" situation. Novak said that because Summit refused to repay Chara's investment, Sadykov could not return to Russia since he could not repay Chara's own investors.

After this last meeting, Sadykov and Topko returned to Moscow. Korostishevsky and Sadykov made frequent calls to Volkov and Voloshin who refused to speak with them. Finally, Korostishevsky was able to arrange another meeting with Volkov and Voloshin for February 21, 1995.

Sadykov and Korostishevsky traveled to New York where they met with Ivankov in an effort to obtain his aid in recovering the money. Ivankov agreed to become involved in the matter. On February 21, 1995, the day of the scheduled meeting with Korostishevsky and Sadykov, Volkov and Voloshin became aware that Ivankov had become involved. As Voloshin testified at trial, Ivankov had a reputation as one of the most powerful members of the Russian criminal world, and Volkov and Voloshin were frightened. They left the Summit Office to avoid meeting Ivankov and waited at a nearby restaurant while Volovnik watched the entrance to Summit's office from across the street. When Volovnik saw Ivankov arrive at Summit's office, he called Volkov and told him that Ivankov had arrived. With this confirmation of Ivankov's participation, Volkov and Voloshin fled to Miami, Florida to seek assistance from a business partner, Leonid Venjik ("Venjik"). Volkov's wife testified at trial that Volkov did not return home to get his luggage and that he called her to warn her not to leave their apartment.

In Miami, with Venjik's assistance, Voloshin and Volkov pursued different strategies to attempt to evade or shield themselves from Korostishevsky, Sadykov, and Ivankov. Voloshin contacted his friends at another criminal group based in Lyubertsky in Russia and ultimately met with them in San Francisco. Voloshin told them falsely that the Chara money had been repaid. Voloshin believed that they would relay this information to Ivankov and that Ivankov would then leave Volkov and Voloshin alone.

While Voloshin was in California, Volkov met with the F.B.I. in Miami to obtain protection. Voloshin also met with the F.B.I. later and obtained their help by also telling them falsely that Summit had already repaid the Chara loan. The F.B.I. began an inquiry into Ivankov's activities at this point and requested and received authorization to tap Ivankov's cellular phone.

Although they returned to New York City in mid-March 1995, Volkov and Voloshin continued to hide from Ivankov and Sadykov. Meanwhile, Ivankov and his associates planned how to obtain the Chara money from Summit. On April 10, 1995, Ivankov met with Leonid Abelis at the Troika Restaurant in New Jersey. Abelis, an associate of Ivankov who had worked with him on several other alleged extortions during the previous two years, testified for the Government pursuant to a cooperation agreement. Abelis testified that during the course of the meeting, Ivankov said that a representative of Chara had "appealed" to him for his help to recover "a substantial amount of money" that an American company "refused to repay." Furthermore, Ivankov told Abelis that if the money were recovered, they would get a share of it for themselves. At Ivankov's request, Abelis contacted Sergey Ilgner to help with "an interesting matter." Ilgner in turn contacted Yura Gladun. During a telephone call on April 12, 1995, Ivankov again told Abelis that "everything will be under his auspices" and that they would have a meeting the next day in an effort to stake out their claim. It was Abelis' understanding that Ivankov meant that other criminal groups who might otherwise be interested in making their own attempt to recover the money would be deterred from doing so once they were aware that Ivankov was involved.

At their scheduled meeting on April 13, Ivankov emphasized for a third time to Abelis, Ilgner, and Gladun that "the most important thing was to stake [the matter] out in his name." Sadykov also attended the meeting and offered to pay the group for their

assistance, at which point Ivankov interjected that everyone at the meeting would get their share. Sadykov provided Abelis and Ilgner with pictures of Volkov and Voloshin, as well as with their telephone numbers, and told them that Volovnik might be useful as a contact. Ivankov later called Abelis and said that he expected that they would keep the $2.6 million for themselves rather than returning it to Sadykov, or at the very least, that they would take half of what each side retained if Sadykov, Volkov, and Voloshin reached a compromise solution.

Abelis met Volovnik and asked to be contacted when Volkov or Voloshin went out to a restaurant so that Abelis could discuss the matter with them at a neutral spot. Volovnik, however, was unable to arrange the meeting immediately. On April 25, 1995, Abelis, Ilgner, and Gladun met with Volovnik to find out why Volovnik had been unsuccessful. Abelis criticized Volovnik for his failure to arrange the meeting, and told him that the case was under the control of Ivankov, that no one could change that, and that Volovnik's "absence of desire to help [them], maybe it could be understood in a wrong way."

Throughout this period, Abelis kept Ivankov abreast of their progress by cellular phone. Abelis and Ivankov did not mention names over the phone in case the phone was tapped. In fact, Ivankov on several occasions expressed annoyance to Abelis that Sadykov persisted in using the parties' given names over the phone, placing everyone at risk. Finally, on Abelis' suggestion, Ivankov told Sadykov to call Abelis when he wanted an update on their progress.

Ultimately, Abelis arranged a meeting with Sadykov at the Russian Samovar restaurant. Topko also attended the meeting. During the course of their conversation, in considering the appropriate methods they should take to recover the money, Abelis asked Sadykov if he were willing to pay for their lawyers or to pay their bail if they were arrested. Sadykov told Abelis that he was not prepared to pay for either, at which point Abelis told Sadykov that he should wait while Ivankov and his group pursued the money "quietly." Topko did not speak during the discussion.

After several aborted attempts at a meeting, on May 25, 1995, Volovnik was finally able to tell Abelis that Volkov and Voloshin could be found at a neutral location that evening. He informed Abelis that Volkov and Voloshin would be at dinner with Venjik, now a Summit officer, at a New York City Hilton Hotel. Abelis, Ilgner, Gladun, and Volovnik traveled to the hotel, where they found Volkov and Voloshin in the Hilton's restaurant. When Voloshin saw Abelis, Voloshin testified that he was scared, fearful and very nervous, because he knew him to be Ivankov's right-hand man, and he knew Ivankov's reputation as "the most influential figure of the Russian criminal world."

After Volkov told them that the money had already been paid back, Abelis responded that "if you want to play these games of silence or not say things, then I'm washing my hands and I cannot vouch for what would happen to you tomorrow or the day after tomorrow." As Abelis testified at trial, the implication of his statement was clear—failure to settle with Ivankov could result in a physical attack at a later date. Voloshin took Abelis's statements as threats to his security and the safety of his family.

After the conversation at the Hilton, Volkov and Voloshin traveled in Abelis' car to the Troika Restaurant in New Jersey. The group soon went upstairs to the second floor office, and around 1:00 a.m., Sadykov arrived with Topko and Novak. Sadykov, Volkov, and Voloshin began to argue, and Abelis directed them to another room to try to work out an arrangement. Sadykov demanded $5 million at first, and Voloshin requested Abelis' assistance to force Sadykov to lower his demand. At this point, Voloshin and Volkov told Abelis that Sadykov had already been paid a $100,000 fee during the original transfer of the Chara money to Summit. Sadykov subtracted the $100,000 that he had already been paid, and, at Abelis' insistence, calculated a lower figure of $3.5 million, to which both Volkov and Voloshin assented. Voloshin testified that Volkov and he had agreed to make the payments because they felt that it was the only way that they would be allowed to leave. Voloshin also testified that Abelis constantly referred to Ivankov having given

Abelis authority to act on behalf of Ivankov and that Abelis had to report to Ivankov. As Voloshin said, "I mean that the only way out of the situation was for us to sign the document." Voloshin testified that Abelis said several times that Volkov "will not walk out of here until this document is signed."

Sadykov and Novak then typed up the agreement that had just been reached. The payments totaling $3.5 million were to be wired to Novak's offshore bank account at Barclay's Bank in the Bahamas rather than to Chara Bank itself. However, the agreement did not contain a payment schedule because Voloshin refused to agree to one without assessing the ability of Summit to make the payments. Voloshin was to contact Ilgner after he had determined a possible payment schedule. Volkov and Voloshin signed the agreement in the presence of Abelis, Ilgner, Topko, Sadykov, and Novak. The proceedings concluded at dawn and Ilgner gave Volkov and Voloshin a ride back to Manhattan. Sadykov left and returned to Moscow the next day. Abelis testified that Ivankov's reputation in the Russian crime world was used to compel Volkov and Voloshin to agree to return the money.

Ivankov contacted Abelis a few days later to find out how the meeting had proceeded. When Abelis told him that Sadykov had already received a $100,000 payment from Summit, Ivankov decided that Sadykov should not receive any money and that the money should be transferred to an account controlled by Ivankov instead of the Novak account. Abelis understood that no money would go to Chara Bank, and that Sadykov would only receive compensation for his personal assistance in procuring the money.

On May 30, 1995, Abelis spoke to Voloshin and surmised that Voloshin was attempting to back out of the arrangement. In response, Abelis said that he had thought they had settled the matter without the use of physical violence. Abelis told Voloshin that he had already informed Ivankov about the agreement and that Ivankov was a "special" person. Shortly thereafter, Voloshin provided Ilgner with the payment schedule. Voloshin then told Abelis that he had provided the payment schedule and that he under-stood that payment was to be made to an account provided by Ivankov rather than to Novak's account.

On May 31, 1995, Abelis, Ilgner, Gladun, and Volovnik went to Summit's office to meet with Volkov and Voloshin. However, when they arrived, neither Volkov nor Voloshin were present. The four walked into Volkov's and Voloshin's office and discovered video equipment provided by the F.B.I. that had been used to tape Ilgner's meeting with Voloshin the previous day. When Volkov and Voloshin arrived, Ilgner confronted them about the tape, but Voloshin was able to explain that it was used to tape Summit meetings only and that the equipment had not been activated when Ilgner had been in the office the previous day. At some point during the course of the discussion, Ivankov called Abelis by cellular phone. When Abelis said that he was meeting with Volkov and Voloshin, Ivankov asked to speak to either of them. Ivankov then spoke with Voloshin, discussed the transaction with him and informed him that he would have to repay the money because Ivankov was now involved. They also agreed to meet at a future date. Abelis provided Voloshin with the new account number for payment, an account at National Westminister Bank in London.

Ivankov, along with Abelis, Ilgner, and Gladun, met with Volkov and Voloshin on June 5, 1995. Before Ivankov arrived, Abelis questioned Volkov and Voloshin about whether the first payment had been made. Voloshin told Abelis that, because of difficulties with the bank, the first payment had not been made. Abelis then told Volkov and Voloshin about a recent conversation that he had had with Topko. Topko had called Abelis and had asked him why Abelis had been "so soft" on Volkov and Voloshin. Abelis told Topko to keep out of the case, that it was no longer his business, and that he could not treat the case the same way it would be treated in Russia.

When Ivankov arrived, Voloshin discussed that the account had been changed; Ivankov told him not to worry and to stay in touch with Abelis. It was agreed that all payments would be made according to the schedule.

The next day, June 6, 1995, Voloshin called Abelis and told him that the first payment had been made. Using false wire transfer documents provided by the F.B.I., Voloshin faxed Abelis a record of the purported first payment. Voloshin promised Abelis that the transfer would take one day, until June 7, 1995, to clear. When the payment was not received by Ivankov's bank, Abelis called Voloshin to find out what had happened to the money. After telling Abelis that he would check with his banker, Voloshin called Abelis back later on June 7 to tell him that Voloshin's banker was not in his office. Abelis did not have the opportunity to determine whether the first payment had been made. The next day, F.B.I. agents arrested Ivankov, Abelis, Ilgner, Topko, and Novak.

## DISCUSSION

### I.

■ Appellants Novak and Topko challenge the sufficiency of the evidence supporting their respective convictions. It is well settled that "[i]n challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden." *United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir.), *cert. denied*, — U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996); *see also United States v. Al Jibori*, 90 F.3d 22, 26 (2d Cir.1996); *United States v. Amato*, 15 F.3d 230, 235 (2d Cir.1994) (quoting *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir.1992)). We view the evidence as a whole "in the light most favorable to the government, drawing all inferences and resolving all issues of credibility in the government's favor." *Giraldo*, 80 F.3d at 673 (citations omitted); *see also United States v. Desimone*, 119 F.3d 217, 223 (2d Cir.1997). Further, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir.1994), *cert. denied sub nom., Romano v. United States*, 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995). Our ultimate determination is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see, e.g., Amato*, 15 F.3d at 235; *United States v.*

*Roldan–Zapata*, 916 F.2d 795, 802 (2d Cir. 1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). The government need not disprove "every possible hypothesis of innocence," and the jury may properly "base its verdict upon inferences from circumstantial evidence." *Roldan–Zapata*, 916 F.2d at 802 (citations omitted); *see also Desimone*, 119 F.3d at 223.

■ While only slight evidence is required to link another defendant with a conspiracy once the conspiracy has been shown to exist, a defendant's "mere presence" at the scene of a crime is not enough to show knowing participation in the conspiracy. *See Giraldo*, 80 F.3d at 673; *Amato*, 15 F.3d at 235; *Rivera*, 971 F.2d at 890–91; *United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983). Nor is " '[a]ssociation with a conspirator, without more, [ ]sufficient to establish the requisite degree of participation in a conspiratorial venture.' " *United States v. Scarpa*, 913 F.2d 993, 1005 (2d Cir.1990) (first alteration in original) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1134 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976)). However, "a defendant's ... presence may establish his membership in the conspiracy if all of the circumstances considered together show that by his presence he meant to advance the goals of that conspiracy." *Giraldo*, 80 F.3d at 673. Thus, the evidence must demonstrate purposeful behavior by a defendant to further the conspiracy to show membership in that conspiracy. *See Scarpa*, 913 F.2d at 1005.

■ We turn first to Novak's contention that the evidence did not support his conviction for conspiracy to commit extortion and attempted extortion. Novak does not dispute that a conspiracy to commit extortion existed, but rather argues that he was not a member. However, at trial, the government presented evidence from which the jury could have rationally drawn the opposite conclusion. The evidence showed that Novak was a close friend of both Sadykov and Topko. During his trips to New York City to obtain the Chara money, Sadykov stayed in Novak's home and used Novak's home telephone to

call Ivankov. Novak was present at and participated in key meetings involving the payment of the Chara money. Novak attended the December meeting at Michael's Restaurant among Volkov, Sadykov, and Volovnik at which additional pressure was placed on Volkov to pay Sadykov. In fact, Volovnik testified that Novak berated Volkov for not paying the money to Sadykov, telling Volkov that the failure to make the payments, as Volkov had previously promised to do at the December 2, 1994 meeting, had placed Sadykov in a difficult situation such that Sadykov could not return to Russia. This statement indicated that Novak, who had not been present at the early December meetings at which a split of the Chara funds in return for protection had been discussed, had been informed of the status of the Chara money by Sadykov, Korostishevsky, or Topko. The jury could reasonably have drawn the inference from Novak's presence at this discussion, his understanding of Volkov's past promise to pay, his knowledge that no payment had been made, and Novak's attempt to get Volkov to make the payments, that Novak was aware of and involved in the extortionate attempt to recover the money paid by Chara from the inception of the conspiracy.

Most significantly, however, was the evidence regarding Novak's actions at the May 25, 1995 meeting at the Troika Restaurant. Novak drove two hours late at night in a rainstorm with Sadykov and Topko to reach the Troika restaurant where Volkov and Voloshin had been taken by Abelis, Ivankov's acknowledged associate, following an initial confrontation at the Hilton Hotel in Manhattan. After Novak arrived with Sadykov and Topko, and in response to pressure from Abelis, Volkov and Voloshin agreed early in the morning of May 26, 1995 to pay Sadykov $3.5 million, accounting for Chara's investment of $2.6 million plus interest. Although not involved in the actual negotiations, Novak typed the written agreement on a Troika office computer with Sadykov. Further, Novak provided his offshore bank account in Barclay's Bank to serve as the repository for the $3.5 million to be paid by Volkov and Voloshin. Finally, Novak was present with Abelis, Sadykov, Ilgner, and Topko when Volkov and Voloshin signed the agreement.

Viewing this evidence in the government's favor, the jury could reasonably have inferred that Novak, with Sadykov and Topko, had gone to the Troika to participate in the extortion with full knowledge of its existence and to share in its spoils, specifically, the $3.5 million that was to be paid into Novak's account. Novak's active participation in the evening's events—typing the contract and providing his bank account as the destination of the funds—as well as his presence at the signing of the agreement, could reasonably be interpreted as acts in furtherance of the conspiracy. The jury could reasonably conclude that Novak was not a mere bystander and that this was not a lawful attempt to recover funds for Chara Bank, but rather an effort to obtain the funds from Volkov and Voloshin by the wrongful use of fear.

Moreover, the jury was entitled to place great weight on the fact that the other conspirators trusted Novak to safeguard the $3.5 million payment that was to be made into an offshore bank account to which Novak was the sole signatory. We have noted on other occasions the significance of such evidence. See United States v. Pitre, 960 F.2d 1112, 1122 (2d Cir.1992) (where the evidence showed, in part, that the defendant was arrested with $292,920, the jury could infer that the defendant was aware of his role in a narcotics conspiracy); Scarpa, 913 F.2d at 1006 (jury could view acceptance of $6,000 as evidence of participation in a conspiracy and could reject the defendant's contention that he accepted the money as a favor to his brother); see also United States v. Sisca, 503 F.2d 1337, 1343 (2d Cir.) ("the suggestion that members of a conspiracy would entrust $60,000 in cash and a large quantity of narcotics to one who was not a full partner strains credulity"), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Nor does it matter that Ivankov later decided not to use Novak's bank account, since dissension among coconspirators does not change the fact that the conspiracy existed or that a given individual was a member in it. See Amato, 15 F.3d at 234.

Thus, we find that there was sufficient evidence to sustain Novak's conviction for conspiracy to commit extortion. The same result is warranted for Novak's conviction for attempted extortion since the evidence that sustained the conspiracy conviction adequately supports the attempted extortion conviction.

■ Topko's challenge to his conviction is even less substantial. The evidence at trial showed that Topko was present at the December 1, 1994 meeting among Sadykov, Korostishevsky, Volkov, and Voloshin at the outset of the conspiracy. At that meeting, Korostishevsky and Sadykov proposed to split the $2.6 million owed by Summit to Chara between Sadykov's group and Volkov and Voloshin, in exchange for which Korostishevsky would provide protection from whichever criminal groups were trying to recover the money on behalf of Rachouk's wife. Voloshin testified at trial that he asked Topko that evening whether Topko was serving as a representative of Sadykov and Korostishevsky in the matter of the Chara money, to which Topko replied, "Yes, something like that." Abelis testified that Topko attended the April 1995 meeting at the Russian Samovar restaurant between Abelis and Sadykov at which Abelis asked Sadykov if Sadykov was willing to pay for a lawyer and for bail if they were caught. Topko was also at the meeting at the Troika Restaurant on May 25, 1995, and was present along with Abelis, Ilgner, Sadykov, and Novak when the "agreement" was signed by Volkov and Voloshin. Furthermore, Voloshin testified that Abelis told Volkov and Voloshin that Topko had called Abelis to ask why Abelis had been "so soft" on Volkov and Voloshin. The jury was entitled to conclude from the evidence presented at trial that Topko had joined the conspiracy and that he had acted to further it by serving as a representative of Sadykov and Korostishevsky and by his presence at the various meetings.

## II.

■ All defendants challenge both the propriety of the district court's jury instruction on the "fear" element of extortion and the refusal to give their proffered instruction.

In charging the jury, the district court gave the following charge with respect to the "fear" element of extortion:

The essence of the crime of attempted extortion is a defendant's knowing an[d] willful attempt to use fear. *What the law prohibits is knowingly and willfully attempting to create or instill fear, or knowingly and willfully attempting to use or exploit existing fear, when this is done with the specific purpose of inducing another to part with his or her property.* A defendant need only attempt to exploit a fear to be guilty of attempted extortion; he need not attempt to create it. However, although the alleged victims' fear of harm or loss need not be instilled by the defendant, *there must be proof that the defendant, aware of the victims' fear did or said something in an attempt to exploit that fear.* (A–252.) (emphasis added.)

The appellants contend that this charge allowed the jury to convict Ivankov—and those with whom he allegedly conspired—on the basis of Ivankov's reputation as a prominent figure in the Russian criminal underworld alone, since almost anything he did could be interpreted as an "attempt to exploit" fear of him. (Ivankov Br. at 22.) Instead, they argue that the district court should have included their requested language which requires that "the defendant, aware of the victims' fear[,] did or said something in an attempt to exploit that fear ... *through the use of a threat or implicit threat.*" (Ivankov Br. at 22.)

■ We review the propriety of a jury instruction *de novo*. *See United States v. Russo*, 74 F.3d 1383, 1392 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996). An appellant bears the burden of showing that the requested instruction " 'accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced.' " *United States v. Dove*, 916 F.2d 41, 45 (2d Cir.1990) (quoting *United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir.1986), *cert. denied,* 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988)); *see also United States v. Thompson*, 76 F.3d 442, 454 (2d Cir.1996). " 'A jury instruction is erroneous if it mis-

leads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" *United States v. Masotto,* 73 F.3d 1233, 1238 (2d Cir.) (quoting *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994)), *cert. denied,* — U.S. ——, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996).

■ Because appellants' requested instruction on the "fear" element of extortion under the Hobbs Act did not "accurately represent[] the law in every respect," we find that the district court properly rejected the additional charge. *See Dove,* 916 F.2d at 45 (quoting *Ouimette,* 798 F.2d at 49). First, the language of the Hobbs Act in no way requires the instruction which the appellants sought from the trial court. Title 18, Section 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The statute does not limit the definition of extortion to those circumstances in which property is obtained through the wrongful use of fear created by implicit or explicit threats, but instead leaves open the cause of the fear.

Further, the law within this Circuit is clear that the wrongful use of fear need not be a consequence of an implicit or explicit threat as the appellants contend. In *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987) (en banc), there was no dispute that the following instruction was correct: "[i]t is not necessary that the Government prove that the fear of economic loss was the consequence of a direct threat made by the defendant." *See id.* at 955 ("[W]e all agree that the instructions given to the jury were correct.") (Kearse, J., dissenting). The Courts of Appeals in other Circuits share this view. *See, e.g., United States v. Williams,* 952 F.2d 1504, 1513 (6th Cir.1991); *United States v. Nedza,* 880 F.2d 896, 902 (7th Cir.), *cert. denied,* 493 U.S. 938, 110 S.Ct. 334, 107 L.Ed.2d 323 (1989); *United States v. Lisinski,* 728 F.2d 887, 890–91 (7th Cir.), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984). Therefore, the district court correctly refused to give the additional instruction.

■ Moreover, appellants' argument that Ivankov could have been convicted solely on the basis of his reputation as a prominent Russian gangster is not an accurate reading of the charge as a whole. The charge made it clear that, to be found guilty of attempted extortion, a defendant must knowingly and willfully create or instill fear, or use or exploit existing fear "with the specific purpose of inducing another to part with his or her property." The district court emphasized that the statute required that the defendant "aware of the victims' fear did or said something in an attempt to exploit that fear."

This requirement of affirmative exploitation of fear was stressed by the district court's repeated emphasis on the need for the Government to show the "wrongful use of actual or threatened force, violence, or fear." This statement was made in the course of reading the indictment, in reading the relevant provisions of the Hobbs Act, in describing the elements of the offense in general and in detail, and in describing the unlawful agreement at issue in the case. (*See* A–249 line 14; A–250, line 3; A–250, line 11; A–251, line 3; A–258, line 24; A–260, line 16, A–263, line 23). Thus, the jury was repeatedly told that only the "wrongful" use of fear to obtain property was extortion. Further, the district court instructed the jury that the Government was required to prove that the defendants acted "knowingly and intentionally." The Court defined intentionally as "to do an act willfully with a bad purpose, to do something the law forbids; that is, to obtain money from another with his consent, induced by wrongful use of actual or threatened force, violence or fear." (A–253–54.) Hence there could be no question that the Government was required to prove, not simply that Ivankov had a bad reputation, but that the defendants knowingly and intentionally, with a bad purpose, wrongfully and affirmatively exploited fear to obtain money. This was sufficient. *See United States v. Locascio,* 6 F.3d 924, 942 (2d Cir.1993), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994) (finding no error in charge where the district court "as a whole accurately charged the jury, especially considering that the court did properly impart the motive requirement numerous times and did give the jury the in-

dictment," which also used the proper language.)

■ It is true that care must be taken to assure that apparently innocent activities are not swept up by the Hobbs Act. For example, a burglar alarm salesman may exploit a customer's fear of burglary. But it could not be said that he was "wrongfully" using fear or that he intentionally used that fear "with a bad purpose." In this case, to avoid question, it would have been better if the charge had read that: "The essence of the crime of attempted extortion is a defendant's knowing and willful attempt to use fear *wrongfully.*" Similarly, it would have been better to say, "there must be proof that the defendant, aware of the victims' fear did or said something in an attempt *wrongfully* to exploit that fear." However, the charge in this case did adequately inform the jury that it was the "wrongful" use of fear that was prohibited by statute.

Hence, taken as a whole, the charge in this case provides no basis for reversal.

### III.

■ The appellants also challenge the district court's refusal to give a "missing witness" instruction with respect to Alexander Volkov, who was not called to testify at trial by either side. The decision to give a missing witness charge "lies in the sound discretion of the trial court." *United States v. Torres,* 845 F.2d 1165, 1170–71 (2d Cir. 1988). The instruction "permits the jury to draw an adverse inference against a party failing to call a witness when the witness's testimony would be material and the witness is peculiarly within the control of that party." *United States v. Caccia,* 122 F.3d 136, 138 (2d Cir.1997); *see also Torres,* 845 F.2d at 1169. In determining whether a witness was "available," we consider " 'all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility.' " *Torres,* 845 F.2d at 1170 (quoting *United States v. Rollins,* 487 F.2d 409, 412 (2d Cir.1973)). *See also Caccia,* 122 F.3d at 139 ("The requirement that the witness be 'peculiarly within the control' of the party ensures that the inference is not available to be drawn against a party who, in comparison with an adversary, lacks meaningful or pragmatic access to the witness.")

Although Volkov declined to be interviewed by the defendants' attorneys, he was willing to testify if called and was in fact at the trial on several occasions. Significantly, the government represented to the district court that it had provided the appellants with all F.B.I. records documenting conversations with Volkov, as well as Summit business records and any other material regarding him. Given these facts, the witness "was not so peculiarly within the Government's control as to require the defendant's requested instruction." *Caccia,* 122 F.3d at 139. Moreover, the district court made no comment in the charge with respect to "uncalled" witnesses, but instead allowed defense counsel to argue the issue to the jury. *See id.* (noting with approval the possibility of not giving any instruction for uncalled witnesses who are equally available). Therefore, we find no error in the district court's decision not to give a "missing witness" instruction. *See also United States v. Sorrentino,* 72 F.3d 294, 298 (2d Cir.1995).

### CONCLUSION

We have reviewed all of the appellants' remaining contentions and find them to be without merit. Therefore, the judgment of the District Court is affirmed.