300 F.3d 286
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Natavan ALESKEROVA, Defendant-Appellant-Cross-Appellee,
Aydyn Ibragimov, aka "Aidyn," aka "Aideen," Defendant.
 Docket No. 00-1444(L).
 Docket No. 00-1526(XAP).
 United States Court of Appeals, Second Circuit.
 Argued May 25, 2001.
 Decided August 8, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Richard M. Asche, (Russell M. Gioiella, Jack T. Litman, Todd B. Terry, on the brief), Litman, Asche & Gioiella, LLP, New York, N.Y., for Defendant-Appellant-Cross-Appellee Natavan Aleskerova.
 Alexander H. Shapiro, Assistant United States Attorney (Mary Jo White, United States Attorney for the Southern District of New York, and Baruch Weiss, Assistant United States Attorney, on the brief), New York, N.Y., for Appellee-Cross-Appellant.
 Before: WALKER, Chief Judge, KATZMANN and CUDAHY,[1] Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Defendant Natavan Aleskerova appeals from a jury verdict convicting her of two counts of possession of stolen property, in violation of 18 U.S.C. § 2315, and one count of conspiracy to possess, conceal, and sell stolen property, in violation of 18 U.S.C. § 371. Aleskerova, a citizen of Azerbaijan, was sentenced by the United States District Court for the Southern District of New York (Loretta A. Preska, District Judge) principally to eleven months of imprisonment and three years of supervised release.
 
 
 2
 On appeal, Aleskerova challenges (1) the sufficiency of the evidence to support her convictions and (2) the admission of similar bad act evidence pursuant to Fed.R.Evid. 404(b). In a cross-appeal, the government contends principally that, in sentencing the defendant, the district court erred in (1) reducing the loss amount by depreciating the artwork's value because of an earlier, unrelated theft and (2) departing downward to render the defendant eligible to apply for asylum.
 
 
 3
 We affirm the convictions, but remand for resentencing.
 
 BACKGROUND
 
 4
 This appeal adds another episode to the saga of European art that disappeared at the close of World War II. During the war, the Bremen Kunstverein (the "Bremen Museum") secreted over 1000 drawings in the Karnzow Castle, located north of Berlin, Germany. In 1945, soldiers of the Soviet army looted the castle and removed the hidden artwork. Some years later, the KGB donated fourteen of these drawings, including works attributed to such masters as Albrecht Dürer and Rembrandt Harmenszoon van Rijn, to the National Fine Arts Museum of Baku, Azerbaijan (the "Baku Museum"). Shortly after they were exhibited there in 1993, twelve drawings originally from the Bremen Museum (the "Bremen drawings") and 200 other works of art (the "Baku Pieces") disappeared from the Baku Museum.
 
 
 5
 Two years later, Aleskerova and her husband, co-defendant Aidyn Ibragimov, met over dinner in Istanbul, Turkey with Masatsugu Koga, a Japanese businessman. After dinner, Koga went to Ibragimov's hotel room for about one hour. Koga's nurse, Taeko Kishi, later saw photographs of the Baku Pieces and discovered Koga's notes on eight Bremen drawings written on stationery from the hotel in Istanbul.
 
 
 6
 On May 21, 1996, Koga entered the United States. Two days later, Ibragimov and Aleskerova arrived in New York and stayed in Brooklyn with Rovchan Charifov, Aleskerova's son from a previous marriage. By chance, Ibragimov met Jakov Ifraimov, a former acquaintance from Azerbaijan, who also lived in Brooklyn. Upon Ibragimov's request, Ifraimov agreed to store business papers for Ibragimov in his apartment, where he lived with his ex-wife Iskana Mardakhayeva. Later, while Aleskerova waited on the street, Ibragimov and Ifraimov took a package and locked briefcase up to Ifraimov's apartment, where the items remained, hidden in a bedroom closet, throughout the next year.
 
 
 7
 On April 1, 1997, Koga again arrived in New York. Two days later, Ibragimov retrieved objects from the briefcase for a meeting with an "Asian" businessman. In May 1997, Aleskerova returned to Brooklyn and stayed in her son's apartment with her friend Lilia Gousseinova. In a telephone conversation, Ibragimov instructed Aleskerova to "check out something." The next day, Aleskerova went to Ifraimov's apartment and asked Mardakhayeva to show her the suitcase. Mardakhayeva left Aleskerova alone with it for several minutes. Aleskerova departed, leaving the suitcase behind. Gousseinova, who had surreptitiously listened in on the earlier telephone conversation between Aleskerova and Ibragimov, testified that this visit to Ifraimov's apartment was not a social call.
 
 
 8
 At about the same time, Koga presented photographs of twelve drawings to the German Embassy in Tokyo. The German Ministry of Foreign Affairs asked Dr. Anne Roever-Kann, Curator of Prints and Drawings at the Bremen Museum, to review these photographs. She identified eight drawings as having been stolen from the Bremen Museum during the war. In June 1997, Koga faxed a letter to the Bremen Museum, offering to sell the art for six million dollars. Roever-Kann responded by fax agreeing to view the drawings, but warned him that no one, other than the Bremen Museum, would be willing to purchase the art because of its well-known history as stolen war booty. On July 31, 1997, Koga arrived in Bremen with Mahito Ogo, his associate and translator, and met with Roever-Kann and Dr. Rudolf Blaum, Chairman of the Board of Directors of the Bremen Museum. Koga indicated that he had acquired the art with a "Russian partner" and that the art was stored in a safe deposit box in a bank in New York.
 
 
 9
 Subsequent to this meeting, Koga and Roever-Kann arranged for Roever-Kann to view the art in New York City. On September 3, 1997, Ogo told Roever-Kann that the meeting could not take place before September 8. The following day, however, Ogo agreed to a meeting on September 5, at 2:30 p.m. at the Grand Hyatt Hotel in Manhattan ("Grand Hyatt"), where Koga was staying. He informed Roever-Kann that "the wife of the Russian partner" would be bringing the key to the safe deposit box in which the drawings were stored. In response to Roever-Kann's request that they meet in the morning, Ogo insisted on meeting at 2:30 "because the wife of the Russian partner is not in earlier." British Airways records indicated that on September 4, 1997, Aleskerova booked a flight from Baku to New York, via London, scheduled to depart that night at 9:20 and to arrive at Kennedy Airport at 1:40 p.m. the following day. Customs records showed that Aleskerova passed through customs at 2:21 p.m. on September 5.
 
 
 10
 On September 4, 1997, Ibragimov called Ifraimov to tell him that a person, who was already en route via airplane, would pick up the suitcase and package the following day. The next day, Ibragimov called Ifraimov and asked him to meet a businessman at the Grand Hyatt because the person who was supposed to retrieve the suitcase had been delayed. Leaving the suitcase at his apartment, Ifraimov went to the Grand Hyatt and met Koga. After Koga handed him twelve photographs, the men called Ibragimov. Ibragimov gave Ifraimov the combination to the locked suitcase and instructed him to match each photograph to drawings in the suitcase. After Koga told him that they had to wait for people "from Germany," Ifraimov left the hotel room and waited for about an hour and a half.
 
 
 11
 Meanwhile, Roever-Kann, now accompanied by a Japanese interpreter and an undercover agent of the United States Customs Service, met Koga and Ogo in the Grand Hyatt lobby. Ogo told them that the viewing would take place in an apartment in Brooklyn. Koga, Ogo, Ifraimov, and Ifraimov's driver left in a white car and Roever-Kann, the Customs agent, and the interpreter followed in a taxi. Upon instructions from the Customs agent's superiors, however, Roever-Kann, the agent, and the interpreter returned to Manhattan. When Roever-Kann failed to appear in Brooklyn, Koga and the others drove back to the Grand Hyatt. After exchanging several phone calls, Roever-Kann and Koga rescheduled the viewing for September 8.
 
 
 12
 Telephone records introduced at trial indicated that on September 5, a phone call was placed to the Grand Hyatt from Aleskerova's son's apartment about fifty minutes after Aleskerova passed through customs. A second call from the same place was made to the Grand Hyatt one hour later.
 
 
 13
 On September 7, Aleskerova went to Ifraimov's apartment and explained that her plane had been delayed in London, even though airline records indicated that it had actually arrived on time. Ifraimov showed Aleskerova the drawings and demanded to know what was going on. Ifraimov testified that Aleskerova did not respond but instead looked at the drawings, saying "[t]his is good .... it's a very good one." Ifraimov asked Aleskerova to take his place and bring the drawings to the meeting the next day. She refused, stating "[t]his is not my business.... You have been asked to do it, ... so take it." Aleskerova then left the apartment.
 
 
 14
 On September 8, Ifraimov delivered six drawings to Koga in his hotel room and then went to the hotel cafe. After Roever-Kann met with Koga and inspected the art, Customs agents seized the six drawings. Koga was arrested the next day and subsequently pled guilty to participating in a conspiracy to sell the drawings from the Baku and Bremen Museums. By the end of that week, Ifraimov turned over the remaining art to federal prosecutors. Ibragimov has not been found.
 
 
 15
 On October 6, 1997, Aleskerova returned to the United States and was met at Kennedy Airport by her son. Customs agents who were alerted to her arrival followed the vehicle as it left the airport. Aleskerova and her son noticed the surveillance on the Brooklyn Bridge and led the agents on a car chase through Manhattan that ended at Washington Square Park, where Aleskerova was arrested. At the time of her arrest, Aleskerova possessed a recent Russian newspaper detailing Koga's arrest and the seizure of some of the stolen artwork.
 
 
 16
 Aleskerova told the arresting officer that she had not seen Ibragimov since July 1997. Earlier that day, however, she had told an immigration officer at the airport that she had not seen her husband for over a year. There was evidence that both Aleskerova and Ibragimov completed visa applications at the U.S. Embassy in Baku on August 28, 1997.
 
 
 17
 After a three-week trial, a jury found Aleskerova guilty of two counts of possession of stolen artwork, in violation of 18 U.S.C. § 2315, and one count of conspiracy to possess and sell stolen artwork in violation of 18 U.S.C. § 371. This appeal followed.
 
 DISCUSSION
 I. Sufficiency of the Evidence
 
 18
 Aleskerova argues that the evidence was insufficient to support her conviction for conspiracy or possession of stolen property because it failed to establish her specific intent to advance the conspiracy or to possess stolen art. We disagree.
 
 
 19
 "A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." United States v. Samaria, 239 F.3d 228, 233 (2d Cir.2001); see United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir.1991). A defendant must prove that, viewing all of the evidence in the light most favorable to the government, "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." United States v. McDermott, 245 F.3d 133, 137 (2d Cir.2001) (internal quotation marks omitted). Moreover, "only slight evidence is required to link another defendant with a conspiracy once the conspiracy has been shown to exist." United States v. Abelis, 146 F.3d 73, 80 (2d Cir.1998).
 
 
 20
 To establish membership in a conspiracy, the government must prove that the defendant "`knowingly' engaged in the conspiracy with the `specific intent to commit the offenses that were the objects of the conspiracy.'" United States v. Monaco, 194 F.3d 381, 386 (2d Cir.1999) (quoting United States v. Salameh, 152 F.3d 88, 145 (2d Cir.1998)). "[A]bsent evidence of purposeful behavior, mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy...." United States v. Chang An-Lo, 851 F.2d 547, 554 (2d Cir.1988) (internal quotations omitted); see Abelis, 146 F.3d at 80. Thus, a "mere association with conspirators is ... insufficient." Chang An-Lo, 851 F.2d at 554.
 
 
 21
 However, we have found evidence sufficient to support a conspiracy conviction where circumstantial evidence establishes that the defendant associated with the conspirators in furtherance of the conspiracy. See, e.g., United States v. Gordon, 987 F.2d 902, 907 (2d Cir.1993); United States v. Pedroza, 750 F.2d 187, 198-99 (2d Cir.1984). A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, her presence at critical stages of the conspiracy that could not be explained by happenstance, see Pedroza, 750 F.2d at 199, or a lack of surprise when discussing the conspiracy with others, see Gordon, 987 F.2d at 907. Additional circumstantial evidence might include evidence that the defendant participated in conversations directly related to the substance of the conspiracy; possessed items important to the conspiracy; or received or expected to receive a share of the profits from the conspiracy. Samaria, 239 F.3d at 235-36; see United States v. Nusraty, 867 F.2d 759, 764 (2d Cir.1989).
 
 
 22
 Aleskerova's trip from Azerbaijan to New York strongly supports an inference of her intent to participate in the conspiracy. In Pedroza, we found sufficient evidence of a defendant's membership in a conspiracy based on his extraordinary travel plans, which coincided with critical moments of the conspiracy, in the absence of evidence suggesting that "these long trips and timely appearances [had any purpose] other than to further the goals of the conspiracy." 750 F.2d at 199. Similarly, after a last-minute booking on September 4, Aleskerova flew across the Atlantic to arrive just fifty minutes before the scheduled meeting at the Grand Hyatt on September 5. Her flight was booked for the very day that this important meeting was planned and the evidence does not suggest any innocent explanation for the last-minute arrangement of her trip. See id. at 199.
 
 
 23
 The importance of her presence at the meeting is evident from the haggling over the timing of the meeting, which was ultimately delayed because, as Ogo stated, "the wife of the Russian partner is not in earlier." Indeed, Ibragimov's call to Ifraimov on September 4 permits the inference that Aleskerova was expected to bring the art to the Grand Hyatt meeting. In addition, in the absence of evidence of any relationship between Koga and Aleskerova outside of the conspiracy, the jury could infer from the calls to Koga's hotel placed shortly after her arrival that Aleskerova made those calls because she intended to discuss the September 5th meeting with Koga in furtherance of the conspiracy. See Samaria, 239 F.3d at 235. Although Aleskerova ultimately did not attend the September 5th meeting, and later refused to bring the drawings to the September 8th meeting, a lack of cooperation, or even dissension, among co-conspirators "does not change the fact that the conspiracy existed or that a given individual was a member in it." Abelis, 146 F.3d at 81; see United States v. Nersesian, 824 F.2d 1294, 1303 (2d Cir.1987).
 
 
 24
 The circumstances of Aleskerova's May 1997 visit to Ifraimov's apartment, from which it could be inferred that she examined the contents of the suitcase that was filled with art, also tend to prove her specific intent to further the conspiracy. This visit coincided with the beginning of Koga's negotiations for the sale of the art and, according to Gousseinova, was not a social call.
 
 
 25
 Aleskerova's possession of the stolen artwork strengthens the inference of her specific intent. See Nusraty, 867 F.2d at 764. Her knowledge of the combination of the locked suitcase, which can be inferred from her examination of the drawings in May 1997, established her constructive possession. See United States v. Gaviria, 740 F.2d 174, 185 (2d Cir.1984); United States v. Damsky, 740 F.2d 134, 139 (2d Cir.1984). In addition, Aleskerova handled the drawings during her September 1997 visit to Ifraimov's apartment. That she was sent to view the art, was trusted to know its location, and was told the combination to the suitcase strongly suggests her full, knowing participation in the conspiracy. See United States v. Sisca, 503 F.2d 1337, 1343 (2d Cir.1974).
 
 
 26
 In addition, at the time of his arrest, Koga possessed bank account information written in Aleskerova's handwriting and information for her son's bank account. In the absence of any evidence that Aleskerova's son engaged in transactions with Koga, the jury was free to infer that it was Aleskerova, not her son, who expected to share in the proceeds of the sale of the stolen art and to use that inference as evidence of her intent to further the goals of the conspiracy. See United States v. Markiewicz, 978 F.2d 786, 807 (2d Cir.1992).
 
 
 27
 Finally, when Aleskerova arrived in New York, she lied about when she had last seen Ibragimov and led authorities on a chase through Manhattan. Such evidence of false exculpatory statements and flight tends to prove consciousness of guilt. See Gordon, 987 F.2d at 907 (false exculpatory statements); United States v. Harley, 682 F.2d 398, 401 (2d Cir.1982) (flight).
 
 
 28
 Aleskerova relies principally on our decisions in United States v. Nusraty, 867 F.2d 759, 764 (2d Cir.1989), and United States v. Samaria, 239 F.3d 228 (2d Cir.2001), to support her claim that the evidence was insufficient. These cases are easily distinguishable. In both cases, we held that the government failed to establish the defendant's membership in a conspiracy or his knowledge that a crime was afoot with evidence that amounted to little more than the defendant's false exculpatory statement upon arrest and his mere presence on one or two occasions. Samaria, 239 F.3d at 240; Nusraty, 867 F.2d at 764; see Gordon, 987 F.2d at 907 (limiting Nusraty).
 
 
 29
 In contrast to the weak evidence in Nusraty and Samaria, Aleskerova repeatedly handled the stolen property, checked on the artwork, knew the combination to the suitcase containing the art, led authorities on a chase through Manhattan, expected financial rewards from the conspiracy, lied to authorities about her association with Ibragimov, was present in Istanbul when the conspiracy was discussed, called Koga upon arriving in New York, and traveled from Azerbaijan to New York on a last minute trip with no apparent purpose other than to be present in New York for the final negotiations.
 
 
 30
 Aleskerova's challenge to the sufficiency of the evidence to support her convictions on the substantive counts must likewise be rejected. A defendant may be found guilty of a substantive crime on an aiding and abetting theory if she joined the criminal venture, shared in it, and contributed to its success. See, e.g., United States v. Aiello, 864 F.2d 257, 263 (2d Cir.1988). The foregoing evidence easily suffices to demonstrate that Aleskerova aided and abetted Koga and Ibragimov in possessing and selling the stolen artwork.
 
 
 31
 II. Admission of Evidence Regarding the Baku Incident
 
 
 32
 In addition to evidence directly linked to the conspiracy, the government presented evidence that in October 1996, Azerbaijani Customs stopped Aleskerova at an airport in Baku and discovered that she was carrying other stolen artwork (the "Baku Incident"). Because the admission of this evidence is hotly contested on appeal, we account for it in some detail.
 
 
 33
 In a pretrial proffer letter, the government first stated its intention to present evidence pursuant to Fed.R.Evid. 404(b) that items found in Aleskerova's suitcase during the Baku Incident had been stolen from the Azerbaijan State Theater Museum in Baku (the "Theater Museum"). Overruling a defense motion in limine to exclude this evidence, the district court held that "removing items previously stolen from a museum from the country" was "sufficiently similar to the charged acts" as to be probative of "the defendant's intent and plan to receive, possess, and conceal stolen art works from the museums."
 
 
 34
 At trial, the government presented the testimony of Mekhti Magaramov, the deputy director of the Azerbaijan Customs Department, and Zarifa Melikova, an assistant director of the Theater Museum. Magaramov testified that he stopped Aleskerova at the airport because she appeared to be in a hurry to pass customs control. He found "a large quantity of... theatrical posters, a few dolls, paintings, [and] books" in her suitcase under her personal items. Because Aleskerova had failed to comply with the Azerbaijani customs law requiring passengers to declare "historical and art valuables," Magaramov seized them. Aleskerova claimed that none of the items had historical value.
 
 
 35
 In a written statement to Azerbaijani Customs, Aleskerova admitted to having "posters, magazines, and dolls which represent the full spectrum of Azerbaijani life." She claimed that she was taking the items to London to defend her doctoral thesis and to put them in an exhibition. At trial, Aleskerova's friend Yelena Frovola testified that the defendant was writing a book on posters from the 1930s and 1940s but that she was not enrolled in a formal doctoral program and did not have an exhibit planned in London.
 
 
 36
 On November 14, 1996, Melikova inspected the items seized during the Baku Incident. She found that the following seven items bore the stamp and inventory numbers of the Theater Museum ("Theater Museum items"): two commendation letters that were bound in leather or leather-like material, the frames of two dolls, two sketches relating to a Eugene O'Neil production, and one edition of a magazine called "The Theater." These items were contained in the Theater Museum's inventory list, but were missing despite the security procedures to safeguard the collection.
 
 
 37
 In addition to the Theater Museum items, Azerbaijani Customs found other art-related items in Aleskerova's suitcase, including over 200 posters and two paintings by artist Azim Azim-Zade (the "Azim-Zade paintings"). The government conceded that it could not prove that these other items were stolen. Although the district court held that evidence of these other items would not be admitted as similar bad act evidence under Rule 404(b), it admitted the evidence as probative of Aleskerova's knowledge of fine art and as a "customs violation."
 
 
 38
 On appeal, Aleskerova does not dispute that where, as here, the defendant denies wrongdoing, evidence of other similar crimes is admissible under Rule 404(b) to prove the defendant's intent to participate in the conspiracy. See United States v. Teague, 93 F.3d 81, 84 (2d Cir.1996). Instead, Aleskerova contends that the trial court erred by admitting the Theater Museum items under Rule 404(b) because the government failed to prove that they had been stolen. She also argues that the prosecutor misled the jury during his summation by suggesting that the other items found on Aleskerova were stolen.
 
 
 39
 In deciding whether the district court erred in admitting evidence regarding the Theater Museum items under Rule 404(b), we must first determine the applicable standard of review. The defendant concedes that she never objected at trial to their admission. She argues, however, that her in limine motion preserved her objection to the admission of the 404(b) evidence because the district court failed to explicitly state that its pretrial ruling was subject to reconsideration at trial if the government failed to present sufficient evidence that the items were stolen. We disagree.
 
 
 40
 In Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the Supreme Court described the role of the trial court in admitting evidence pursuant to Rule 404(b). The trial judge must instruct the jury to disregard such evidence if the proponent fails to prove, by a preponderance of the evidence, that the similar bad act occurred and was committed by the defendant. See id. at 689, 108 S.Ct. 1496; United States v. Gilan, 967 F.2d 776, 780 (2d Cir.1992). A trial court may, however, admit the evidence conditionally subject to proof that the defendant committed the other crime, allowing the proponent to "`connect it up' later." Huddleston, 485 U.S. at 690 n. 7, 108 S.Ct. 1496 (internal quotation marks omitted). Where the admission of 404(b) evidence is conditional, the Court in Huddleston made clear that "[i]t is, of course, not the responsibility of the judge sua sponte to insure that the foundation evidence is offered; the objector must move to strike the evidence if at the close of the trial the offeror has failed to satisfy the condition." Id. (quoting 21 C. Wright & K. Graham, Federal Practice and Procedure § 5054, at 269-70 (1977)).
 
 
 41
 Based on the Court's decision in Huddleston, we conclude that an in limine motion is insufficient to preserve for appeal objections based on deficiencies in foundation evidence under Rule 404(b). See United States v. Ruffin, 40 F.3d 1296, 1298-99 (D.C.Cir.1994); United States v. Kandiel, 865 F.2d 967, 972 (8th Cir.1989). The district court would not normally be aware that any such deficiency exists until after the evidence is presented at trial. See United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir.1995) (holding in limine motion insufficient where issue cannot be finally decided at pretrial hearing). Indeed, the Supreme Court directed trial judges "neither [to] weigh[] credibility nor make[] a finding that the Government has proved the conditional fact by a preponderance of the evidence" at the time the 404(b) evidence is proffered. Huddleston, 485 U.S. at 690, 108 S.Ct. 1496. After the district court denied the 404(b) in limine motion, it remained the responsibility of the defendant to object at trial to the admission of the Theater Museum items if the government failed to establish the foundation for admissibility, including the fact that they had been stolen.
 
 
 42
 Because Aleskerova failed to renew at trial her objection to the admission of evidence regarding the Theater Museum items, our review is limited to whether the district court committed plain error. See United States v. Thomas, 274 F.3d 655, 666-67 (2d Cir.2001) (in banc); United States v. Jean-Baptiste, 166 F.3d 102, 107 (2d Cir.1999). Our review of the record does not reveal that the error, if any, is "so egregious and obvious as to make the trial judge ... derelict in permitting it, despite the defendant's failure to object." United States v. Tillem, 906 F.2d 814, 825 (2d Cir.1990).
 
 
 43
 While we recognize that the evidence proving the stolen nature of the items was not overwhelming, we do not find that the district court committed plain error by failing to reassess sua sponte the admission of the evidence. Melikova testified that she identified seven items that bore stamps from the Theater Museum, that the items were similar to items described in the museum inventory list, and that those items were missing. This unexplained disappearance of carefully inventoried goods supports an inference of theft. United States v. Izzi, 427 F.2d 293, 297 (2d Cir.1970); see also United States v. James, 923 F.2d 1261, 1268 (7th Cir.1991). In addition, Aleskerova's lie to Azerbaijani Customs regarding her reasons for possessing the items tends to prove her consciousness of guilt. See Gordon, 987 F.2d at 907.
 
 
 44
 Nor did the district court commit plain error by admitting the Theater Museum items despite Aleskerova's arguments that her father-in-law, the founder of the Theater Museum, had given some of the items to her and that her lack of guilt should be inferred from the fact that the Azerbaijani officials returned nearly all of the items to her. The district court is required only to determine whether the jury could reasonably find that the items were stolen, see Huddleston, 485 U.S. at 690, 108 S.Ct. 1496, and Aleskerova's defenses were factors that could be considered, and rejected, by the jury, see United States v. Autuori, 212 F.3d 105, 118 (2d Cir.2000).
 
 
 45
 We also reject Aleskerova's argument that the district court committed plain error because the government failed to show that the items examined by the Theater Museum official were the same as those seized from her by Azerbaijani Customs. The items sufficiently matched Magaramov's inventory list and Aleskerova's statement of items she possessed to support the inference that the items were the same in the absence of evidence to the contrary. See United States v. Grant, 967 F.2d 81, 83-84 (2d Cir.1992) (per curiam). The defendant further contends that the dolls taken from her during the Baku Incident did not belong to the Theater Museum, pointing to a mismatch between some clothing on the seized dolls and the description of the dolls' clothing in the museum's inventory. However, it was not plain error to admit the dolls under Rule 404(b), given Melikova's testimony that the dolls could be removed from the frames for restoration and that some of the clothing matched the description in the inventory list.
 
 
 46
 Finally, we reject Aleskerova's claim that the references in the government's closing to the other items found during the Baku Incident warrant reversal. The prosecutor's single statement referring to the Azim-Zade paintings as stolen, even if misleading, in a lengthy and otherwise proper summation did not affect the fairness of the trial. See United States v. Gabriel, 125 F.3d 89, 96 (2d Cir.1997).
 
 
 47
 Thus, Aleskerova has failed to persuade us that the district court committed plain error. In addition, given the ample evidence to sustain her conviction, the admission of the 404(b) evidence did not affect her substantial rights. See Thomas, 274 F.3d at 668.
 
 III. Cross-Appeal
 
 48
 The district court sentenced Aleskerova principally to a prison term of eleven months. On its cross-appeal, the government challenges the district court's sentence on two grounds: first, that the district court undervalued the artwork leading to a lower sentence under U.S.S.G. § 2B1.1 and, second, that the court departed downward for impermissible reasons. We consider each argument in turn.
 
 
 49
 A. "Loss" determination for sentencing purposes
 
 
 50
 The government claims that the district court erred in its calculation of loss because (1) it improperly reduced the estimated value of the Bremen drawings due to their initial theft from the Bremen Museum in 1945 and (2) the district court's valuation of the art was not adequately supported by the record.
 
 
 51
 The parties contested the valuation of the art in a classic battle of the experts. The government's first expert, Dr. Andrew Robison, Senior Mellon Curator of Prints and Drawings at the National Gallery in Washington, D.C., opined that the Bremen drawings included authentic works by Dürer and either Rembrandt or a student of Rembrandt. He estimated the total value of two Dürers to be $2.5 million and all twelve of the Bremen drawings to be $2.73 million. Robert Kashey, a New York art dealer, estimated that fourteen of the Baku Pieces were collectively worth $18,500.
 
 
 52
 To rebut Robison's testimony, the defense called Dr. Thomas Hoving, former Director of the Metropolitan Museum of Art and an author of a recent book about art forgeries. Hoving opined that the Bremen drawings attributed to Dürer and Rembrandt were fakes and that their value would greatly diminish at the "slightest hint" of inauthenticity. In addition, Hoving testified that the cloud on the title of the Bremen drawings due to the thefts from the Bremen and Baku Museums rendered their worth "nil" because no art gallery or collector would buy them. As of the date of sentencing, the issue of whether the artwork belonged to the Bremen Museum or the Baku Museum had not yet been resolved.
 
 
 53
 The district court credited Hoving's testimony and rejected the government's argument that the art's value should be assessed from the perspective of the Bremen Museum, without consideration of the 1945 theft by the Soviet army. As a result, the district court found that the art in question was only worth $183,500.
 
 
 54
 We review the district court's factual determinations for sentencing purposes for clear error and its application of the Sentencing Guidelines de novo. See United States v. Fitzgerald, 232 F.3d 315, 318 (2d Cir.2000). Application note 2 of § 2B1.1 instructs that, "[o]rdinarily, ... the loss is the fair market value of the particular property at issue." U.S.S.G. § 2B1.1, cmt. 2 (1998).[2] The question for us, apparently one of first impression, is whether the loss should be measured by the value to the original victim (i.e., the Bremen Museum) or the value to the last victim (i.e., the Baku Museum) where a defendant is in possession of stolen property with a cloud on its title due to an earlier, unrelated theft.
 
 
 55
 The government argues that loss should be determined by the value to the victim on the legitimate market, rather than its diminished value on the black market. We agree that such a proposition makes sense in the usual case. See United States v. Coviello, 225 F.3d 54, 63 (1st Cir.2000) ("Obviously, the fact that a product is sold for less because it is stolen provides no basis for lowering the loss calculation. ..."). The government contends that by devaluing the artwork due to the 1945 theft from the Bremen Museum, the district court essentially based its loss calculation on the diminished black market value of the art. We disagree.
 
 
 56
 Hoving's testimony regarding the effect of the cloud on the title related to the value of the Bremen drawings to any possessor on the legitimate market, not the black market. That Aleskerova and her co-conspirators may have believed that the drawings would have sold for millions does not alter the calculus. As we stated in United States v. Robie, "[o]ne who steals rhinestones thinking they are diamonds is surely held to account for the theft of baubles not gems." 166 F.3d 444, 455 (2d Cir.1999).
 
 
 57
 A loss determination that reflects the value of the artwork to the last possessor who operates on the legitimate market is both reasonable and permissible under § 2B1.1. Given the state of uncertainty created by the cloud on the title and the ongoing dispute over which museum could claim legitimate ownership of the drawings, the district court's decision to identify the "victim" as the Baku Museum (the entity directly impacted by the loss due to the chain of theft in which the defendant participated) and not the Bremen Museum (an earlier owner whose claim was uncertain and whose loss, if loss there be, was the fault of a different set of actors) was not clearly erroneous for purposes of § 2B1.1.
 
 
 58
 The government further challenges the district court's final valuation of the art, $183,500, as lacking a factual basis. The district court heard testimony from experts placing the value of the artwork between "nil" and several millions. The district court could make a reasonable finding by settling upon a valuation within the range created by the experts. See U.S.S.G. § 2B1.1 cmt. 3 (1998) ("[L]oss need not be determined with precision."); United States v. Carboni, 204 F.3d 39, 46 (2d Cir.1999). We note that the district court also could have exercised its discretion to use an alternative measure for loss that accounted for values of the artwork to the Baku Museum other than its fair market price, such as its value in generating revenue or its replacement cost, if such evidence had been presented. See U.S.S.G. § 2B1.1 cmt. 2 (1998). To the extent that the district court's loss figure reflects a reliance on Hoving's opinion that the artwork was worthless, such reliance was not clearly erroneous, see Fitzgerald, 232 F.3d at 318, and thus we will not disturb the district court's determination of loss in this case.
 
 
 59
 The government's final objections to the loss calculation, that the court made an arithmetic error and that the value of the Baku works was omitted from the final sum, were not raised at or before sentencing. Thus, we decline to disturb the sentence on these grounds. See United States v. Ben Zvi, 242 F.3d 89, 95 & n. 1 (2d Cir.2001).
 
 B. The Downward Departure
 
 60
 The government challenges the district court's grant of a downward departure on the ground that the district court impermissibly circumvented Congress's legislative decision governing a criminal alien's eligibility to seek asylum. We agree and accordingly remand to the district court for resentencing. In its briefs, the government also argues that the district court's departure usurped the Attorney General's discretion under the immigration laws. Because we hold that the district court overstepped its authority by impinging on the legislative process, we need not address whether it also intruded on the authority of the executive branch.
 
 
 61
 Under the Immigration and Nationality Act ("INA"), an alien who is subject to removal to another country may seek to remain in the United States based upon conditions existing in the other country that present a risk of harm to the alien. The level of risk the alien must prove depends upon the provision of the INA that applies. See Diallo v. INS, 232 F.3d 279, 284 (2d Cir.2000).
 
 
 62
 Under 8 U.S.C. § 1158, an alien may seek asylum if he can prove that he has suffered from past persecution or has a "well-founded fear of future persecution" on the basis of, inter alia, political opinion. Diallo, 232 F.3d at 284; 8 C.F.R. § 208.13. Aliens who have committed an "aggravated felony," however, are ineligible to seek a grant of asylum. See 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i). That classification, reserved for more serious crimes, applies to theft offenses, including receipt of stolen goods, that result in a term of imprisonment of at least one year. See 8 U.S.C. § 1101(a)(43)(G). Under another provision of the INA, however, Congress has provided that where an aggravated felon's life or freedom would be threatened in his home country because of, inter alia, his political opinion and his conviction results in a prison sentence of less than five years, the alien may apply for "withholding of removal." See 8 U.S.C. § 1231(b)(3)(B). Eligibility for withholding of removal requires a demonstration of a "clear probability" that the alien's life or freedom would be threatened. Diallo, 232 F.3d at 284; 8 U.S.C. § 1231(b)(3)(A), (b)(3)(B). This "clear probability" standard places a more demanding burden of proof on the alien than the "well-founded fear" standard applicable in the asylum context. Diallo, 232 F.3d at 284.
 
 
 63
 At sentencing, Aleskerova requested a downward departure to a sentence of less than one year in order to preserve her eligibility to seek asylum under 8 U.S.C. § 1158. She claimed that the current president of Azerbaijan, Heydar Aliyev, would persecute her because she had been employed as a prosecutor under the former president.
 
 
 64
 The district court granted the departure because "the combination of deportation, together with the effect of a lengthy sentence on the asylum application and the prospect of persecution ... take[s] the case out of the heartland." The district court acknowledged that Aleskerova would have been eligible to apply for "withholding of removal," but chose nonetheless to depart "in light of the higher standard required on that ground and ... the great degree of discretion in granting that relief." The district court sentenced Aleskerova to eleven months, thereby rendering her eligible to apply for asylum.
 
 
 65
 We review a district court's decision to depart downward for an abuse of discretion. See Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Whether a particular factor is a permissible basis for departure is a question of law, and "[a] district court by definition abuses its discretion when it makes an error of law." Id. The government argues that the district court lacked the authority to grant a departure for the purpose of making the defendant eligible to seek asylum. We agree.
 
 
 66
 The district court's decision to grant the downward departure was based on its opinion that the heavier burden of proof in the withholding of removal context should not be applied. We have stated, however, that "a court's disapproval of [a congressional] policy choice would not be an appropriate basis for a departure from the Guidelines, for the court's attempt to palliate that choice would encroach on the prerogative of the Legislative Branch." United States v. Restrepo, 999 F.2d 640, 645 (2d Cir.1993); cf. United States v. Koczuk, 252 F.3d 91, 98-99 (2d Cir.2001) (holding that sentencing court may not depart on a basis that contravenes agency regulations). Any frustration over the policy must be remedied through legislative channels, "not the ad hoc granting of departures." Restrepo, 999 F.2d at 646; see United States v. Sentamu, 212 F.3d 127, 137 (2d Cir.2000).
 
 
 67
 Congress has made a legislative choice that, in the absence of the narrow grounds for withholding of removal, every alien who commits an aggravated felony must be removed from the United States, regardless of the possible merits of her asylum request. Courts do not have the authority to cast aside this legislative decision. See Miller v. French, 530 U.S. 327, 341, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000); Loving v. United States, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). Just as a district court is not free to undermine a statutory prohibition by directly contravening its command, it may not do so indirectly by fashioning a sentence specifically to ensure that the statute does not apply.
 
 
 68
 Aleskerova contends that forbidding departures to render an alien eligible for asylum contravenes the Supreme Court's decision in Koon, in which the Court stated that "for the courts to conclude a factor [that is unmentioned in the guidelines] must not be considered under any circumstances would be to transgress the policymaking authority vested in the Commission." 518 U.S. at 106-07, 116 S.Ct. 2035. However, the Koon decision is limited to sentencing determinations that are made in the absence of consideration by the Sentencing Commission but that fall within the scope of its authority. It has no force where Congress, the source of the Commission's policymaking authority, has affirmatively addressed the interplay between criminal convictions and specific collateral consequences. Cf. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for ... the agency[ ] must give effect to the unambiguously expressed intent of Congress."); INS v. Chadha, 462 U.S. 919, 953-54 n. 16, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (stating that the boundaries of delegated authority are subject to judicial review). Neither the courts nor the Commission have the authority to disrupt the balance struck by the legislative branch between criminality, deportation, and the possibility of persecution.
 
 
 69
 Finally, Aleskerova argues that, even if normally forbidden, United States v. Restrepo, 999 F.2d 640, 644 (2d Cir.1993), and United States v. Tejeda, 146 F.3d 84, 88 (2d Cir.1998), leave open the possibility that deportation, in combination with other factors, may provide a permissible basis for a downward departure. She contends that the threat of persecution and her ineligibility to apply for asylum are "pertinent collateral consequences" that combine to make her deportation "extraordinary in nature or degree." Tejeda, 146 F.3d at 88; Restrepo, 999 F.2d at 644. We find nothing "extraordinary in nature or degree" about the uniform application of the immigration laws.
 
 
 70
 We have carefully considered the other arguments made by the parties and find them to be without merit.
 
 CONCLUSION
 
 71
 The judgments of conviction are affirmed. The sentence is vacated and the case is remanded to the district court for resentencing.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Richard D. Cudahy, Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [2]
 Citations are to the guidelines in effect at the time of Aleskerova's sentencing. Section 2B1.1 has since been amended, but the amendments do not affect our analysis