**UNITED STATES of America,**
**Appellee,**

v.

**Darryl HENDERSON, Defendant–**
**Appellant.**

**No. 07–1971–cr.**

United States Court of Appeals,
Second Circuit.

Dec. 17, 2008.

David A. Lewis, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, for Appellant.

David M. Rody, Celeste L. Koeleveld, Assistant United States Attorneys, for Lev L. Dassin, Acting United States Attorney for the Southern District of New York, for Appellee.

PRESENT: Hon. DENNIS JACOBS, Chief Judge, Hon. RICHARD C. WESLEY, Hon. PETER W. HALL, Circuit Judges.

## SUMMARY ORDER

Darryl Henderson appeals from a judgment of conviction entered on May 3, 2007, following a nine-week jury trial in the United States District Court for the Southern District of New York (Owen, J.). In January 2007, Henderson was convicted on seven counts, including: (1) racketeering (Count One); (2) racketeering conspiracy (Count Two); (3) conspiracy to distribute cocaine (Count Three); (4) conspiracy to commit Hobbs Act robbery (Count Seven); (5) Hobbs Act robbery (Count Eight); (6) conspiracy to distribute crack (Count Eleven); and (7) distribution of crack (Count Sixteen). He was acquitted of five other counts, including three counts of capital murder.

On April 23, 2007, Henderson was sentenced to life in prison without parole on Counts One, Two, Three, and Eleven; 20 years on Counts Seven and Eight; and 30 years on Count Twelve, all to run concurrently. He brings five challenges on this appeal.

Henderson first argues that statements he made at the police precinct should have been suppressed as the result of a seizure that was not supported by probable cause or consent. We review the denial of the suppression motion *de novo. United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991). We conclude that there may have been constitutional error, but

that the admission of the statements was harmless.

"A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17–18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (internal quotations and citations omitted).

Henderson seeks to suppress a number of statements he made at the police precinct on January 31, 2002, including the statement that, "I got to stay a soldier, I can't give these guys up ... They know where my family lives, they know where I live, they'll kill me, I'm not going to give anybody up."

Henderson cites *Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), and *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), but those cases are inapposite. Unlike Henderson, the defendants in *Kaupp* and *Dunaway* confessed to crimes during the course of their unlawful seizures. When a jury convicts after learning of a confession, it can hardly be stated that the admission of such confession was harmless because it did not "contribute to the verdict obtained." *Mitchell*, 540 U.S. at 18, 124 S.Ct. 7. In contrast, Henderson's statements concede familiarity with the crime, but amount to a denial of direct involvement by indicating that his silence was protecting others. We can say beyond a reasonable doubt that the admission of the statements was harmless.

In any event, Henderson was acquitted of five counts (including the three most serious counts) and the other evidence introduced at trial (Wilson's testimony about the events on the night of the murders; phone records showing that Henderson frequently telephoned the apartment where the crimes took place (and abruptly ended the calls at or about the hour of the murders); and various photos connecting Henderson with "Murder Unit" members) was more than adequate for the jury to convict on the other seven counts.

■ As to the RICO conviction, Henderson argues that the evidence was insufficient to show that: (1) "Murder Unit" was a racketeering enterprise, and (2) Henderson conducted the affairs of the enterprise through a pattern of racketeering activity.

A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir.2003) (internal quotations and citations omitted). In evaluating a sufficiency of the evidence claim, the court must "view[ ] all of the evidence in the light most favorable to the government," *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir.2002), "resolve all issues of credibility in favor of the jury's verdict," *United States v. Desena*, 260 F.3d 150, 154 (2d Cir.2001) (internal quotations and citations omitted), and "credit[ ] every inference that the jury might have drawn in favor of the government," *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998). The court will not disturb a conviction unless no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bruno*, 383 F.3d 65, 82 (2d Cir. 2004) (internal quotations and citations omitted).

In order to secure a RICO conviction, "the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'" *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (quoting 18 U.S.C. § 1962(c)). Section 1962(d) of the RICO statute also makes it unlawful "to conspire to violate any of the

[other] provisions...." 18 U.S.C. § 1962(d).

■ As to the "enterprise" challenge, the term includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The term is construed "as broadly as possible." *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.1989)(*en banc*). "There is no restriction upon the associations embraced by the definition: an enterprise includes any ... group of individuals associated in fact." *Turkette*, 452 U.S. at 580, 101 S.Ct. 2524. The definition—though broad—is not without limits. A RICO enterprise must be something more than a simple conspiracy; there must be some sort of ongoing informal organization or structure. *See id.* at 583, 101 S.Ct. 2524.

Henderson contends that the evidence is insufficient to show the requisite structure, hierarchy, organization, and management. He relies on Third Circuit case law—primarily *United States v. Riccobene*, 709 F.2d 214 (3d Cir.1983)—which requires proof that a RICO enterprise has some sort of hierarchy or decision-making framework. *Id.* at 222. The Second Circuit, however, has explicitly rejected that approach. *United States v. Edwards*, 214 Fed.Appx. 57, 63 (2d Cir.2007) (summary order). In this Circuit, a RICO enterprise's organization "is oftentimes more readily proven by what it does rather than by abstract analysis of its structure." *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir.1991) (emphasis omitted) (internal quotations and citations omitted). To that extent, this Circuit has found that a drug-dealing organization is an enterprise for RICO purposes when, among other things, "lieutenants" of the organization obtained drugs and delivered them to street-level dealers, dealers sold the drugs for a 20% profit, the lieutenants delivered money to a leader, and several leaders collaborated on "enforcing the enterprise's exclusive control" over its territory. *United States v. Jones*, 482 F.3d 60, 69–70 (2d Cir.2006). By that standard, the evidence presented against Mr. Henderson was sufficient.

"Murder Unit" included both "bosses" and "workers"; the "bosses" negotiated and coordinated with each other to obtain and sell drugs and to share "workers"; the group used color-coded ziploc bags to identify the sources and types of its various narcotic products; "bosses" maintained and/or had access to weapons and ammunition which were intended for use in the protection of the group's business; the group defended its territory; "bosses" agreed on various amounts of "rent" to be paid by other drug dealers wishing to do business in "Murder Unit" territory; and so forth. The evidence introduced by the government here was sufficient.

■ As to the pattern of racketeering activity, the RICO statute's "pattern" component requires the government to demonstrate (*inter alia*) that the racketeering acts are related and pose a threat of continued criminal activity. *United States v. Diaz*, 176 F.3d 52, 93 (2d Cir.1999). "Relatedness" requires a showing that the RICO acts have "the same or similar purposes, results, participants, victims, or methods of commission," *United States v. Simmons*, 923 F.2d 934, 951 (2d Cir.1991) (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)), and that the offenses are "related to the [RICO] enterprise's activities ... or [that] the defendant was enabled to commit the offense solely by virtue of his position in the enterprise." *United States v. Miller*, 116 F.3d 641, 676 (2d Cir.1997) (internal quotations and citations omitted).

According to Henderson, the charged acts were solely the crimes of Charod Becton and his individual accomplices, and do not amount to a pattern of gang activity simply because Charod Becton and his accomplices were associated with "Murder Unit."

Henderson cites the Fifth Circuit's decision in *United States v. Carlock*, 806 F.2d 535 (5th Cir.1986), which requires the government to show both that a defendant's affiliation with an enterprise "facilitated his commission of the racketeering acts, and that the predicate acts had some effect on the enterprise." *Id.* at 546. This is not what the Second Circuit requires. In *United States v. Minicone*, 960 F.2d 1099 (2d Cir.1992), the Second Circuit explained that the pattern requirement was intended " 'to prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts.' " *Id.* at 1106 (quoting *Indelicato*, 865 F.2d at 1383). Accordingly, the Second Circuit requires the demonstration "that the defendant was 'enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise,' or that 'the predicate offenses are related to the activities of that enterprise.' " *Id.* at 1106 (emphasis omitted) (quoting *United States v. Robilotto*, 828 F.2d 940, 947–48 (2d Cir.1987)).

Here, the government adequately demonstrated that the predicate offenses were related to the activities of the enterprise. The evidence introduced at trial established that "Murder Unit" sold and distributed drugs, protected its territory from other drug dealers, committed armed robberies, and extorted money from outsiders. The predicate offenses here—robbery and drug conspiracy—occurred directly within "Murder Unit" territory which allowed greater ease and security in their commission. In addition, Henderson's member-

ship and position in "Murder Unit" enabled him (and Becton and Edwards) to commit the crimes: the crime scene itself was a storage location for some of "Murder Unit's" drug products; Becton's connections allowed the perpetrators to have a market for the stolen drugs; and "Murder Unit" had, in the late 1990s, committed another armed robbery of other drug dealers. Furthermore, Wilson—a "Murder Unit" member—provided a staging point for the crime in his apartment, and gave the group safe haven there afterward. In sum, there was more than adequate evidence presented with respect to both relatedness and a "pattern of racketeering acts" to survive this sufficiency challenge.

Henderson's RICO sufficiency challenge is therefore rejected.

■ Henderson contends that the district court erred by: (1) admitting "other acts" evidence pursuant to Federal Rule of Evidence 404(b), and (2) failing to conduct Rule 403 balancing before admitting it. Specifically, Henderson challenges the district court's admission (over objection) of evidence regarding Henderson's involvement in two incidents: (1) a 1996 event concerning a group of men (some associated with "Murder Unit") riding in a van from which shots were fired, and (2) a 1988 conviction for distributing heroin near a school.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). In short, the defendant is protected against the inference that he has a propensity to commit crimes, and therefore committed a crime in the instant case. *See United States v. Edwards*, 342 F.3d 168, 178 (2d Cir.2003) ("[s]uch reasoning ... calls for the very propensity inference prohibited under Rule 404(b)"). However, evidence of other acts may be admitted to

show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Evidence admissible on these alternative grounds must nonetheless be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

Here, the government offered the van evidence as direct proof of Henderson's association with "Murder Unit" and some of its core members, and not as impermissible propensity evidence. The government also argued that the evidence was probative of "Murder Unit's" nature, existence, and area of operations, and was relevant to refute the Defendant's suggestion that "Murder Unit" was an aspiring rap group rather than a violent, drug-selling enterprise. With respect to the heroin conviction, the government argued that it was offered to show Henderson's intent to engage in a large-scale narcotics offense, and to explain Henderson's absence (due to his imprisonment as a result of the conviction) during the early 1990s when "Murder Unit" was formed.

We review evidentiary rulings for abuse of discretion, *United States v. Brand*, 467 F.3d 179, 200 (2d Cir.2006), and find no error here.

■ The government adequately demonstrated that the evidence was introduced for permissible purposes under Rule 404, and there was no Rule 403 error. Defense counsel repeatedly raised Rule 403 objections to the admission of the evidence, and the objections were repeatedly overruled. It is clear, therefore, that the judge had occasion to consider the nature of the evidence and the implication of its admission, and ultimately concluded that the evidence was not overly prejudicial under Rule 403. He did not—as Henderson alleges—fail to conduct the balancing, nor was he required to state all of his reasons for admitting the evidence. *Cf. Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2468, 168 L.Ed.2d 203 (2007) (explaining that in the context of sentencing, the Supreme Court does not require a full statement of reasons from the district court; instead, the sentencing judge may "rely [ ] upon context and the parties' prior arguments to make the reasons [for its decision] clear."). Where, as here, "[w]e see no indication that the trial judge failed to perform the necessary Rule 403 analysis, or misapplied Rule 404(b), or abused his discretion in any way", we will not disturb his decision. *United States v. Perez*, 325 F.3d 115, 131 (2d Cir.2003).

The jury verdict does not suggest that any impermissible "blanket" propensity inference was drawn against Henderson, nor was the admitted evidence so "unduly prejudicial" that the jury convicted Defendant on the basis of the Rule 404 evidence alone. Henderson was *acquitted* on five of the twelve counts charged, including the most serious capital murder offenses. Where "[i]t is clear from the partial verdict of acquittal that the jury 'carefully evaluated the evidence and rendered a discriminating verdict' and not one that was based on uncharged acts or bad character", there was no error. *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir.2006) (quoting *United States v. Casamento*, 887 F.2d 1141, 1153 (2d Cir.1989)); *see also United States v. Diaz*, 922 F.2d 998, 1007–08 (2d Cir.1990) (partial acquittal belies notion of prejudice).

■ Finally, even if it had been an abuse of discretion to allow the evidence seized from the van incident or the heroin conviction, the error was harmless. There was ample other evidence—including Wilson's testimony—of both "Murder Unit's" prior activities and the fact that

Henderson had in the past possessed firearms and sold crack.

■ ■ " 'The exclusion of a proposed expert witness will not constitute an abuse of discretion unless it is manifestly erroneous.' " *In re Bd. of Directors of Telecom Argentina, S.A.,* 528 F.3d 162, 175 (2d Cir.2008) (quoting *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004)). The district court's decision here was not manifestly erroneous.

Expert testimony is appropriate "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed.R.Evid. 702. The Advisory Committee Notes explain that the test for determining whether an expert may be used is " 'the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' " Fed.R.Evid. 702 advisory committee's note (quoting Mason Ladd, *Expert Testimony,* 5 Vand. L.Rev. 414, 418 (1952)).

The government's expert testified that the injuries inflicted on the murder victims would have resulted in "gushing", "pumping" and/or "splashing" blood, and that the perpetrators who caused such injuries would likely have been covered in blood. This testimony corroborated Wilson's description of Henderson, Becton, and Edwards as having "a lot of blood in the chest area" of their clothing on the morning of the murders.

To counter that testimony, the defense sought to introduce the testimony of its own expert, a bloodstain pattern and crime scene analyst. The district judge excluded the defense expert after learning that he would testify that there was "no evidence that anybody [at the] scene [of the crime] was significantly bloodied by any means or mechanism."

We are confident that the district court did not abuse its discretion in excluding the testimony of Henderson's expert. It was reasonable for Judge Owen to conclude that introducing expert testimony to impeach Wilson's description of the perpetrators as being "covered" in blood would not have assisted the jury. So while it was perhaps (harmless) error for the district court to allow testimony from the government expert which said as much, it was not error to exclude the defense expert. The fact that Henderson was acquitted of the murder charges—the very subject of the defense expert's proposed testimony—further supports our conclusion that his exclusion was harmless.

■ ■ Finally, Henderson argues that the sentence fails to take into account Henderson's acquittal on the intentional murder charges. "The courts of appeals review sentencing decisions for unreasonableness." *United States v. Booker,* 543 U.S. 220, 264, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). "Reasonableness review does not entail the substitution of our judgment for that of the sentencing judge. Rather, the standard is akin to review for abuse of discretion." *United States v. Fernandez,* 443 F.3d 19, 27 (2d Cir.2006). Although we do not presume that a Guidelines sentence is reasonable, we have "recognize[d] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Id.; see also Rita,* 127 S.Ct. at 2465 ("An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the [Sentencing] Commission's judgment in general.").

38

Henderson identifies three errors in the imposition of his life sentence, that the court: (1) based the sentence on the erroneous belief that Henderson personally decided to kill the victims; (2) failed to consider Henderson's intentional murder acquittals as bearing on the weight of the evidence against him; and (3) based the sentence on acquitted conduct. In short, the defendant argues that the district court judge misunderstood the meaning of both the felony murder convictions and the intentional murder acquittals, and that this error requires resentencing by a different judge.

■ The defendant's argument is not compelling. Both the Sentencing Guidelines and the United States Probation Office recommended the life sentence. Four of the seven counts on which Henderson was convicted carried maximum sentences of life in prison (Counts One, Two, Three, and Eleven); two other counts (Seven and Eight) carried 20–year maximum sentences; and another count (Count Sixteen) carried a 30–year maximum sentence. Given the length of the maximum sentences for all of the convicted counts, Henderson's life sentence is not unreasonable. Also, contrary to the defendant's argument, "district courts may find facts relevant to sentencing by a preponderance of the evidence, *even where the jury acquitted the defendant of that conduct* ...." *United States v. Vaughn,* 430 F.3d 518, 527 (2d Cir.2005) (emphasis added).

The sentencing transcript shows that the primary "errors" asserted are based on isolated comments made by the judge during a long colloquy with both parties concerning the import of the jury's verdict on the sentence. After reviewing the transcript, we conclude that the sentencing judge understood the import of Henderson's acquittal on intentional murder, but recognized that he had been *con-victed* of seven other counts, all of which were properly considered in determining the length of the sentence ultimately imposed. The Court's sentence was clearly based on the statutory ranges and Guidelines calculations governing the *convicted* crimes, which, along with consideration of the defendant's unique history and characteristics and all of the other § 3553(a) factors, is precisely how a sentence should be determined. The district court exercised its ample discretion in fashioning Henderson's sentence—a sentence which fit squarely within both the Guidelines and Probation's recommendation.

For the foregoing reasons, we hereby **AFFIRM** the judgment of the district court.